EQUAL EMPLOYMENT OPPORTUNITY COMMISSION and Lester Binns, Plaintiffs,

v.

MILLER BREWING COMPANY, Defendant.

No. 81–C–578.

United States District Court, E.D. Wisconsin.

Dec. 29, 1986.

Frances H. Assa, Milwaukee, Wis., for E.E.O.C.

Jeffrey R. Myer, Milwaukee, Wis., for Binns.

George K. Whyte and Ely A. Leichtling, Milwaukee, Wis., Miller Brewing Co.

## DECISION AND ORDER [*]

WARREN, Chief Judge.

On November 4, 1975, Lester Binns (Binns) was hired by Miller Brewing Company (Miller). Binns served as a first line supervisor in the Packaging Department. He was responsible for the "B–51 Soaker" which cleaned bottles in the preparation for filling with beer. On May 7, 1979, Binns resigned. The resignation became effetive on May 18, 1979.

On October 29, 1979, Binns filed a charge with the Equal Employment Opportunity Commission (EEOC). Binns alleged that Miller violated Title VII by racially discriminating against him in regard to promotion. On February 20, 1980, Binns amended the charge and added that he was physically harassed on the job. The EEOC commenced this action on May 26, 1981. The EEOC alleged that Miller employed racially discriminating employment practices and policies which prevented Binns from obtaining a promotion to a group supervisor position. The EEOC did not allege constructive discharge in its complaint. The EEOC sought injunctive relief, including back pay and reinstatement of Binns with promotion to group supervisor.

On January 14, 1982, Binns filed a motion to intervene as plaintiff. Binns also added a claim of constructive discharge under Title VII, 42 U.S.C. § 1981, the Wisconsin Fair Employment Act, and the public policy of the State of Wisconsin. Binns seeks equitable relief, compensatory damages for mental distress, humiliation and embarrassment, and punitive damages.

## REASONS FOR THE RESIGNATION

The chain of command for the Packaging Department at the Milwaukee Miller brewing plant in which Binns worked was, while Binns was employed, Packaging Supervisor, Group Supervisor, Unit Manager, Packaging Manager, Production Manager, and Resident (or Brewery) Manager

On May 7, 1979, Binns submitted to Miller a written resignation. His reason for resignation was listed as personal. In the exit interview, Binns stated that his reasons for resignation were that his parents, who resided in Georgia, needed help and he could not get home to Georgia because of the overtime he was required to put in. Binns also had asked for a transfer to the Albany, Georgia plant, but was told that Miller did not do that. Binns also listed the following complaints at the interview:

He had asked, for example, three weeks ahead of time off to run in the Al McGuire run. He was told to ask again before the weekend. He did and was assigned to work. Other supervisors got that weekend off when they had not planned on it. He was told he wouldn't get promoted here, and he felt his evaluations were unfair. He asked questions and probed each fact that was brought up and felt he showed them all to be unsubstantiated. His shift got higher production and he had better rapport and control of his people. He stuck it out for the next year or so, but it never sat right with him. For example, on the day before his unsatisfactory review, Dave Schilke congratulated him on the production record he had set on the previous shift. His area ran about 7,000 cases before he took over and discipline was

[*] The Court has determined that only this portion of the Decision And Order shall be published.

non-existent. He brought it up to 16,000 cases and started enforcing rules.

Binns also stated at the exit interview that he had a personality conflict with Bob Fink. Binns felt that he was not being judged fairly and should have been promoted. "He honestly felt he was promotable and that his record and experience showed that." Also listed on the exit interview report is a statement that Binns was satisfied with his shift assignment because he could run and bike in the mornings. At his disposition, Binns, however, stated that he never said that he was satisfied with the shift assignment.

In addition to the complaints listed above, Binns at his disposition stated that he told Robert Cady, the employment manager, additional reasons for his decision to quit which Cady did not report. Binns listed the following additional reasons.

First, when Binns began at Miller, Cady told him that having a degree and prior supervisory experience in a manufacturing plant were prerequisites to work at Miller. Binns, however, claims that he learned of other people of unspecified races who did not have degrees. For example, one woman, Cheryl Miller, became a supervisor even though she did not have a degree.

Binns also stated that in 1975, when he was hired, Cady indicated that there would be promotional opportunities. Binns argues that white employees were being promoted throughout the country, and he was still in the same position even though Miller had "approximately hundreds of openings." Binns stated that in 1977, Krueger told him that he would never be promoted at the Miller Brewery.

Binns was also told that vacation time was to be picked based on seniority. Binns stated that less senior employees were given preference over him. Binns stated, as a specific example of harassment, that one less senior employee (of unspecified race) was allowed to pick vacation time at Christmas while Binns' request for vacation was denied.

Moreover, he claims he was told that he could not go to school under Miller's tuition reimbursement plan because his job required him to work various shifts; although he states that white employees were allowed to go to school.

Binns also told Miller that he wanted to work second shift so he could attend school during the day. Binns stated that the next week he was put on third shift by Dennis Puzach, first line supervisor. Binns was told that he could not pick any shift he wanted. Miller would make that determination. Binns stated that other employees of unspecified races had been allowed to pick shifts.

After quitting time, some employees, including Fink and Puzach, would hang around until 2:00 a.m. or 3:00 a.m. drinking beers and inviting female personnel into the office and allowing them to use the men's rest room. Binns happened to be in the rest room on one occasion when the female personnel had to use it. Binns, however, admitted that other male employees of unspecified races faced the same problem with the rest room.

Furthermore, Fink shoved Binns with his forearm and pushed him off a desk. Binns stated that this happened every day at the end of the shift for a period of about a week in early 1976 while Fink was, as Binns was, a first line supervisor. Fink later became Binns' group supervisor and then his unit manager. Binns complained to Al Fletcher, a black male who was then the labor relations representative in the Industrial Relations Department, and to Krueger, who was then a unit manager in the Packaging Department. They thought it was a joke and Krueger laughed. They sent Binns to see Daniel Uzelac, who was then the packaging manager. Binns asked Uzelac if he wanted him to continue to work at Miller or intended for Binns to leave. Uzelac told Binns not to quit but to stay on and he would rectify the situation. Uzelac did and it never occurred after that week.

Binns also overheard Fink tell a group of people in 1977 that he would "keep [Binns'] ass down [on the 51 soaker]." In addition,

Binns stated that Michael Williams, who was a first line supervisor and later a group supervisor, followed him around like a watchdog for a while. When he told Fink about it, however, Fink talked to Williams and the behavior stopped.

Fink criticized Binns for being too strict with hourly employees, and yet, on his next performance appraisal which is dated June 23, 1977, Fink stated that Binns allowed workers to do what they wanted to do.

In 1977 or 1978, the Maintenance Department accused Binns of not reporting a machine breakdown. David Green, however, who was the production manager, investigated and determined that Binns had reported the breakdown. During that same time period, the Maintenance Department claimed that there was nothing wrong with another machine that Binns had complained about even though there was in fact something wrong with it.

Fink also made a remark about Binns being tardy when he came in five minutes late after a big snow storm. Binns stated that thirty or forty other people were absent. Binns did not complain to his supervisors at that time because they were in the same room when the remark was made.

On June 23, 1977, Binns was evaluated. On this evaluation, it stated that Binns had an absentee problem. Binns stated that he only missed three days during the year.

Binns stated that he informed Mr. Krueger, his supervisor, that he wanted to maintain his off-shift schedule for one more week because his house closing was scheduled for 11:00 a.m. Binns was then rescheduled to work the first shift on the day of the closing.

Finally, in February 1979, Binns had an industrial accident. Binns stated that he had to argue with "the superintendent" that his hand was bleeding excessively and that he needed immediate medical attention.

## PERFORMANCE EVALUATIONS

When Binns started his employment at Miller, his yearly salary was $15,000.

Binns received a salary increase every year he was with Miller. Binns' salary increased 10% to $16,500 in September 1976. His salary increased 9% to $18,000 in May 1977. Binns' salary increased 10% to $19,800 in January 1978. In January 1979, he received an 11% increase. For the twelve-month period preceeding his resignation, Binns received in excess of $25,000 including overtime wages.

While at Miller, Binns was evaluated several times. These evaluations will be briefly summarized. The first evaluation submitted to this Court for this motion was filled out on August 9, 1976. Ken Krueger, unit manager in the Packaging Department, stated on the evaluation that "Les is doing well as first-line supervisor. He has some problems relating to our terminology and policies." In the part of the evaluation that Binns did not see, Krueger noted "Les is developing into a good first-line supervisor. He needs much additional training before he succeeds in his present position and could be considered for any advancement." This evaluation occurred nine months after Binns was hired.

The next evaluation occurred on March 7, 1977 and was drawn up by Robert Flach, Binns' group supervisor. Binns was rated "very good" in the categories of knowledge and problem-solving; "good" in the categories of aggressiveness, planning and timeliness; "fair" in the categories of attitude, follow-through, involvement, self-improvement, progress, self-starter, and promotability; and "poor" in the category of communication.

The next evaluation occurred on June 20, 1977. This evaluation stated that Binns had "[g]ood co-operation in moving manpower to need areas and good utilization of what manpower he had." Furthermore, it stated that paperwork was accurate, but that details were sketchy and that he tended to leave out problems that needed attention. These complaints about Binns' work, however, were not slowing production. The efficiency rate of the soaker was at fifty-four percent.

Another evaluation was done by Bob Flach, but has no date. Binns' job performance was rated as "very good" in the knowledge category, but also noted that he was "unwilling to share." He was rated "good" in the categories of attitude, aggressiveness, planning, self-improvement, timeliness, and progress; "fair" in follow-through and involvement; and "poor" in communication. It was also noted that Binns was reluctant to get others involved in his problems.

The next review occurred on June 23, 1977. It was done by Ken Krueger. At this time, Binns had improved his supervisory effectiveness, but it was noted that he was an ineffective communicator who got easily discouraged when he didn't readily see management respond to him. He was also criticized for being very weak in written communications. His absentee record was also not satisfactory. He was listed as not currently promotable, but that his job performance was *nearly* satisfactory.

Binns was then evaluated on November 16, 1977, by Robert J. Fink, the unit manager in the Packaging Department. The evaluation was positive. Fink noted that Binns had shown good improvement in supervising and had progressed very well in his employee relationships. Binns, however, had not mastered the terminology in the production line and had difficulty communicating problems with the maintenance force. Binns' potential to move to higher levels of organizational responsibility was assessed at "moderate". Nevertheless, he was characterized as "not currently promotable."

The final evaluation that has been submitted to the Court on this motion was prepared on December 1, 1978, by Robert Fink. Binns was praised for his production efficiency having consistently had the highest efficiencies of the three shifts. Two of Binns' weakest skills were his written and oral communication at all levels of interaction. Binns was ranked as meeting the position requirements.

Binns has responded with examples of white employees who were criticized for similar problems, but who were, nevertheless, promoted. For example, James Kayon was promoted to group supervisor even though his performance was ranked as satisfactory. He lacked performance consistency, he had some difficulty getting along with other workers and his written production reports needed to be improved. Nevertheless, he was commended as a strong supervisor.

Another employee, Franklin Riehle, was promoted to group supervisor. His performance was satisfactory and he had a good relationship with union personnel and first-line supervisors. He was, however, criticized for sanitation.

Roger Kopac was also promoted. He was criticized in his job performance appraisal for failure to enforce company safety rules in a fair and consistent manner. He also needed to be more aggressive in handling his supervisory position. He received, however, a highly satisfactory overall rating. Kopac was promoted with less than a year of experience in packaging.

After two years of employment, Stanley Orcholski was promoted to group supervisor. On his performance appraisals, he was told to improve his communications, he was criticized for safety and accident frequency, and for not improving product quality. Orcholski did not have a college degree.

One year after employment with Miller, Cheryl White was promoted to group supervisor. On her performance appraisal, she was commended for excellent managerial skills and communications. She was criticized as having only average technical knowledge of equipment and as having a tendency to block out suggestions.

Michael Williams was also promoted. On his evaluations, he was commended for being very efficiency conscious, communicating well and being knowledgeable about the machinery. He was criticized for sanitation, safety, cost savings and for needing to be more forceful with supervisors and hourly employees.

\*       \*       \*       \*       \*       \*

### Motion for Partial Summary Judgment

Miller raises two issues as its basis for the motion for partial summary judgment. First, Miller argues that because Binns did not raise the constructive discharge with the EEOC, this Court should not examine it. Secondly, Miller argues that intent should be an element of a constructive discharge claim and Binns fails to present evidence of intent, therefore, the claim should be dismissed.

#### A. *Constructive Discharge Not Raised With the EEOC.*

When the EEOC commenced this action, it alleged that Miller had employed racially discriminatory employment practices. Binns in the intervenor's complaint also alleged that he was constructively discharged. Miller argues that the constructive discharge claim is unrelated to the EEOC charges and should be dismissed. "The correct rule to follow in construing EEOC charges for purposes of delineating the proper scope of a subsequent judicial inquiry is that the complaint in the civil action ... may properly encompass any ... discrimination like or reasonably related to the allegations of the charge and growing out of such allegations...." *Jenkins v. Blue Cross Mut. Hospital Ins., Inc.*, 538 F.2d 164, 167 (7th Cir.), *cert. denied*, 429 U.S. 986, 97 S.Ct. 506, 50 L.Ed.2d 598 (1976) (quoting *Danner v. Phillips Petroleum Co.*, 447 F.2d 159, 162 (5th Cir.1971), *reh'g denied*, 450 F.2d 881 (5th Cir.)). It is important to note that Binns was not represented by counsel at any time during the EEOC proceedings.

In *Haines v. Kerner*, 404 U.S. 519, 520, 92 S.Ct. 594, 595, 30 L.Ed.2d 652 *reh'g denied*, 405 U.S. 948, 92 S.Ct. 963, 30 L.Ed.2d 819 (1972), the Court stated that "we hold to less stringent standards [the allegations of a *pro se* complaint] than formal pleadings drafted by lawyers...." The Seventh Circuit stated the guidelines in which this Court must follow:

> [T]he Civil Rights Act is designed to protect those who are least able to protect themselves. Complainants to the EEOC are seldom lawyers. To compel the charging party to specifically articulate in a charge filed with the Commission the full panoply of discrimination which he may have suffered may cause the very persons Title VII was designed to protect to lose that protection because they are ignorant of or unable to thoroughly describe the discriminatory practices to which they are subjected....

*Jenkins*, 538 F.2d at 168 (quoting *Willis v. Chicago Extruded Metals Co.*, 375 F.Supp. 362, 365–66 (N.D.Ill.1974) (footnotes omitted)).

In this case, while Binns, as an untrained layman, did not link up his alleged harassment to his constructive discharge, at least he alerted the EEOC and Miller that there were claims of harassment, and he did complain of these harassment claims. It does not take a great leap of faith to draw the conclusion or at least an inference that maybe Binns was harassed and maybe that is a reason or one of the reasons that he left. The Court will review Binns' constructive discharge claim.

#### B. *Elements of Constructive Discharge.*

##### 1. Intent.

Constructive discharge occurs when "the employer deliberately makes an employee's working conditions so intolerable that the employee is forced into an involuntary resignation, then the employer has encompassed a constructive discharge and is as liable for any illegal conduct involved therein as if it had formally discharged the aggrieved employee." *Bourque v. Powell Electrical Mfg. Co.*, 617 F.2d 61, 65 (5th Cir.1980). The doctrine of constructive discharge originally developed in labor relations cases. In labor relations cases, two elements must be established to prove constructive discharge: "first, the employer's challenged conduct must be so intolerable that the employee is forced to quit; second, the conduct must be undertaken with the intention of encouraging or discouraging membership in a labor union." *Jack Thompson Oldsmobile, Inc. v. NLRB*, 684

F.2d 458, 463 (7th Cir.1982). In employment discrimination cases, however, the courts are divided on the issue of whether "the imposition of intolerable working conditions must be with the purpose of forcing the employee to resign." *Bourque*, 617 F.2d at 65.

The Fourth and Eighth Circuits require the plaintiff to prove that the employer's actions were intended to force the employee to quit. *EEOC v. Federal Reserve Bank*, 698 F.2d 633, 672 (4th Cir.1983); *Johnson v. Bunny Bread Co.*, 646 F.2d 1250 (8th Cir.1981).

██ The Sixth Circuit requires that the employer's intent must be examined and the "reasonably forseeable impact of the employer's conduct upon the employee." *Held v. Gulf Oil Co.*, 684 F.2d 427, 432 (6th Cir.1982). The majority of circuits, however, have adopted an even lower standard. In *Bourque*, the Fifth Circuit was presented with the occasion of discussing whether or not "imposition of intolerable working conditions must be with the purpose of forcing the employee to resign." 617 F.2d at 65. The court expressly declined to require the intent test stating that "such a rule is inconsistent with authority in this Circuit and, we believe, with the realities of modern employment." *Id.* Constructive discharge occurs when a reasonable person in the plaintiff's position would feel compelled to resign because of the conditions. The District of Columbia, the Second Circuit, the Ninth Circuit and the Eleventh Circuit are in agreement with the Fifth Circuit. *Clark v. Marsh*, 665 F.2d 1168 (D.C.Cir.1981); *Pena v. Brattleboro Retreat*, 702 F.2d 322 (2d Cir.1983); *Nolan v. Cleland*, 686 F.2d 806 (9th Cir.1982); *Henson v. Dundee*, 682 F.2d 897 (11th Cir. 1982).

Prior to 1986, the Tenth Circuit required the plaintiff to demonstrate that the employer intended the resignation. In *Derr v. Gulf Oil Corp.*, 796 F.2d 340 (10th Cir. 1986), the Tenth Circuit overruled prior cases and adopted the test set forth in *Bourque* and *Clark*.

The Equal Employment Opportunity Commission has also examined this issue and has established the following elements which must be established in order to constitute constructive discharge:

(1) A reasonable person in the charging party's position would have found the working conditions intolerable,

(2) conduct that constituted a Title VII violation against the charging party created the intolerable working conditions, and

(3) the charging party's involuntary resignation resulted from the intolerable working conditions.

33 Fair Empl.Prac.Cas. (BNA) 1887, 1892 (1983). The EEOC stated that "[t]he Commission will not require a showing that the intolerable working conditions were imposed deliberately by the employer, nor will it require a showing that the employers imposed them with the actual intention of having the employee resign." *Id.*

In dictum, the Seventh Circuit described a case of constructive discharge as follows:

A public employee who drove an employee having a contract of employment to resign by making life unbearable for him, through excessive demands for overtime or other breaches of the employment contract, might be violating the Fourteenth Amendment and Section 1983. This would be a case of constructive discharge on which see *Bourque v. Powell Elec. Mfg. Co.*, 617 F.2d 61, 65 (5th Cir.1980)....

*Brown v. Brienen*, 722 F.2d 360, 365 (7th Cir.1983). On this issue of constructive discharge, the Court cited to *Bourque*, the Fifth Circuit case which declined to require intent.

The Northern District of Illinois has examined the intent issue and has concluded:

In short, we believe that the Seventh Circuit would follow the weight of authority and would not impose the unduly onerous burden of showing that the employer acted with the intention of forcing the employee to quit.

*Bailey v. Binyon*, 583 F.Supp. 923, 929 (N.D.Ill.1984); *Bernstein v. Consolidated*

*Foods Corp.*, 622 F.Supp. 1096, 1101 (N.D. Ill.1984).

One legal commentator demonstrated the difference between the two standards with the following example:

An employee suffers repeated discriminatory acts, including denials of promotion, transfer, and education, because he is black; nonetheless, his employer considers him a valuable employee in his present position. The employer attempts to answer the employee's protests that he is being discriminated against by explaining that blacks are simply not ready to assume higher positions in the company.

In this example, if the employee resigns and brings suit under title VII, he should prevail on his claim of disparate treatment because he could show intentional differential treatment motivated by an intent proscribed by title VII. Under the reasonable employee standard, the plaintiff would probably prevail on a constructive discharge claim. The employee could identify several different types of discrimination, attempts to mitigate by transfer requests and objections, and continued affronts to him because of his race. Under the employer intent standard, however, the employee would not be able to show that the employer possessed a specific intent to compel his resignation. If the employee lost on the issue of constructive discharge, a court would conclude that his departure was voluntary and award back pay only up to the date of his resignation. Given such an outcome, the employee has not been made whole because he has not been placed in the situation he would have been in had he not been the victim of discrimination.

Note, *Choosing a Standard for Constructive Discharge in Title VII Litigation*, 71 Cornell L.Rev. 587, 614–15 (1986).

▮ In *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 418, 95 S.Ct. 2362, 2372, 45 L.Ed.2d 280 (1975), the Supreme Court in determining remedies for Title VII violations delineated the two purposes behind the statute: first, it is to act as a deterrent to discrimination, and secondly, "to make persons whole for injuries suffered on account of unlawful employment discrimination." The Court feels that the purposes of Title VII are more properly served by not requiring the plaintiff to demonstrate intent. The Court believes that the Seventh Circuit would follow the weight of authority in the majority of jurisdictions and not require the plaintiff to prove that Miller intended to force Binns to resign.

**C.** *Summary Judgment on the Constructive Discharge.*

The standard for summary judgment in employment discrimination cases has been recently restated by the Seventh Circuit:

Summary judgment is properly granted only if it appears "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Rule 56(c), Federal Rules of Civil Procedure. In determining whether any issues of material fact are in dispute, the inferences drawn from the record must be viewed in the light most favorable to the non-moving party. *Rodeo v. Gillman*, 787 F.2d 1175 (7th Cir.1986); *Janowiak v. City of South Bend*, 750 F.2d 557, 559 (7th Cir.1984). We have frequently noted that summary judgment may be inappropriate when motive or intent are at issue, as is often true in discrimination cases. *See, e.g., Stumph v. Thomas & Skinner, Inc.*, 770 F.2d 93, 97 (7th Cir.1985).

*Bartman v. Allis-Chalmers Corp.*, 799 F.2d 311, 312 (7th Cir.1986). "The constructive discharge doctrine applies when an employee has resigned his employment under such circumstances that his resignation is treated as a discharge for the purpose of proving a *prima facie* case of employment discrimination." *Vaughn v. Pool Offshore Co., etc.*, 683 F.2d 922, 925 (5th Cir.1982).

▮ Constructive discharge occurs when working conditions are so "difficult or unpleasant that a reasonable person in the employee's shoes would have felt com-

pelled to resign." *Alicia Rosado v. Garcia Santiago,* 562 F.2d 114, 119 (1st Cir.1977). "Application of this 'reasonable person' test involves complex questions of fact, including, *inter alia,* the nature of the working conditions, their difficulty or unpleasantness, and what a reasonable person would or would not do under such conditions" *Bernstein v. Consolidated Foods Corp.,* 622 F.Supp. 1096, 1101 (N.D. Ill.1984). The question of what a reasonable person would do is a question of fact and normally should be left for the trier of fact. *Bailey v. Binyon,* 583 F.Supp. 923, 929 (N.D.Ill.1984); *Bernstein,* 622 F.Supp. at 1101. "Situations may exist, however, where an employee's actions are unreasonable as a matter of law and summary judgment is appropriate on the issue of constructive discharge." *Bernstein,* 622 F.Supp. at 1101; *Schaulis v. CTB/McGraw Hill, Inc.,* 496 F.Supp. 666, 676 (N.D.Cal. 1980) (summary judgment granted because plaintiff failed to demonstrate that working conditions were peculiar to her). *Bourque* and other subsequent cases have established that an employee who resigns based on an isolated violation of the discrimination statute is not acting reasonably. *Bailey,* 583 F.Supp. at 929. The employee must remain in his position unless it is an "aggravated situation" beyond "ordinary" discrimination. *Id.* Constructive discharge claims have not succeeded where there has been a denial of a promotion or when low supervisor appraisals are given when they are deserved. *Irving v. Dubuque Packing Co.,* 689 F.2d 170 (10th Cir.1982) (court remanded because jury instruction was confusing as to whether failure to promote was sufficient for constructive discharge; aggravating factors are necessary); *Junior v. Texaco, Inc.,* 688 F.2d 377 (5th Cir. 1982) (low appraisal by supervisor did not render working conditions intolerable nor was it an invitation to quit); *Fearrington v. American Indemnity Co.,* 22 Fair Empl. Prac.Cas. (BNA) 1538 (S.D.Tex.1978) (no constructive discharge after plaintiff was refused a promotion for which she was not qualified).

In one case, the plaintiff was given a new position. He then complained that his new position was a sham. His secretary was removed from him and all he had was a desk, a telephone, and a job that required only one hour per day to perform. He subsequently resigned and brought an action for constructive discharge. Judge Rovner from the Northern District of Illinois denied summary judgment. *Bernstein,* 622 F.Supp. at 1102–03.

In *Bailey v. Binyon,* the plaintiff worked in a restaurant. An officer of the restaurant was complaining about the food. The plaintiff told the officer that he did not make the food. The officer then made the following remarks: "All you niggers are alike," "you're not a human being, you're a nigger", and "you'd stay if you weren't a sissy. If you were a man, you'd stay." The plaintiff did not return to work. The court denied a motion to dismiss the complaint because the question of constructive discharge was properly left for the trier of fact. 583 F.Supp. at 934.

The Eighth Circuit did not find a constructive discharge when racial terms such as "niggers" were used infrequently and were limited to casual conversation between employees. *Johnson v. Bunny Bread Co.,* 583 F.Supp. 923, 930 (8th Cir. 1984).

In *Vaughn v. Pool Offshore Co.,* a black man who worked on an offshore oil rig was subjected to "pranks, tricks, heavy handed humor and crude language" and assigned two terms as a roughneck. Nevertheless, nearly all employees were subject to this type of treatment. The Fifth Circuit declined to find a constructive discharge based on these facts. 683 F.2d at 926.

In *Bourque,* also a Fifth Circuit case, the plaintiff argued that she was constructively discharged because she was receiving $200.00 per month less than the males who held similar positions. The Fifth Circuit held that the plaintiff agreed to work for unequal pay and therefore, she accepted the conditions and was not forced into involuntary resignation.

In *Taylor v. Jones,* 653 F.2d 1193 (8th Cir.1981), the court found a constructive discharge where a black employee of the

National Guard had been subjected along with other black employees to terms such as "niggers" and "spooks." The court stated that the plaintiff had been subjected to more than "isolated, casual ethnic slurs."

The Ninth Circuit has also held that "a history of unlawful discrimination provides sufficient aggravating factors...." *Nolan v. Cleland*, 686 F.2d at 814. Ms. Nolan was subjected to numerous instances of discrimination. First, she was not permitted to participate in the Veteran's Administration (VA) Graduate Employment Program. Secondly, a VA official refused to provide her with necessary evaluations for VA assignments. Another VA official, provided an inaccurate evaluation which the court found was discriminatorily motivated. Finally, she was assigned a position she had not requested. Nolan subsequently resigned. The court reversed the district court's grant of summary judgment.

In *Clark v. Marsh*, the District of Columbia Court of Appeals found that there was "a continuous pattern of discriminatory treatment encompassing deprivation of opportunities for promotion, lateral transfer, and increased education training, existing over a period of several years." 665 F.2d at 1174. The plaintiff had an outstanding employment record, but had obtained only one promotion. Plaintiff's complaints of this treatment were ignored. The court held that the plaintiff had been forced to retire.

Aggravating factors have been found when a female employee has received unequal pay because of her sex, but when she complained, she was harassed, and files and other materials were removed from her desk. The court found a constructive discharge. *Scott v. Oce Industries, Inc.*, 536 F.Supp. 141, 146 (N.D.Ill.1982). A pregnant woman was transferred to a position which required heavy manual labor and which posed the possibility of harm to the plaintiff and her baby. When she complained, her supervisor "snickered" and refused to correct the situation. The Fifth Circuit found a constructive discharge. *Meyer v. Brown & Root Const. Co.*, 661 F.2d 369, 372 (5th Cir.1981).

Miller argues that Binns cannot show that it created intolerable working conditions such that a reasonable person would resign. Miller argues that the fact that it did not promote Binns was not racially motivated. Miller sets forth that the job performance reviews demonstrate that Binns was performing his supervisory duties generally at an average level and that his superiors consistently commented on and even spoke with Binns about his difficulty with written and verbal communications.

After carefully reviewing all the supporting documents filed for purposes of this motion and the pleadings, this Court DENIES summary judgment to the defendant. Binns argues that he was constructively discharged because Miller failed to promote him, he had scheduling problems, and racial comments were made about him. Failure to promote is insufficient by itself to establish constructive discharge. Therefore, the other complaints must be very offensive. A question of fact exists as to whether or not a reasonable person would have resigned in view of the other factors. This Court cannot find as a matter of law that Binns' actions were unreasonable.