**Lloyd J. THAMES, Plaintiff,**

v.

**MAURICE SPORTING GOODS, INC., Defendant.**

**No. 86 C 10186.**

United States District Court, N.D. Illinois, E.D.

May 13, 1988.

Fred Louis III, Carolyn Noonan Parmer, Olson, Grabill, Hoffman & Louis, Chicago, Ill., for plaintiff.

Fred R. Kimmel, Arvey, Hodes, Costello & Borman, Chicago, Ill., for defendant.

## MEMORANDUM OPINION AND ORDER

SHADUR, District Judge.

Lloyd Thames ("Thames") has sued his former employer Maurice Sporting Goods ("Maurice"), charging (in Complaint Count I) race discrimination in violation of 42 U.S. C. § 2000e–2(a) ("Title VII") and (in Complaint Count II) age discrimination in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 623(a). Maurice has moved for summary judgment under Fed.R.Civ.P. ("Rule") 56. For the reasons stated in this memorandum opinion and order, its motion is denied.

### Facts [1]

Thames is a 52–year-old black man who was hired by Maurice, a sporting goods wholesaler, in 1964. In 1965 Thames became Maurice's Assistant Warehouse Manager, and in 1966 he assumed the position of Warehouse Manager.

Maurice's operation grew considerably over the years, with sales increasing from $2.6 million in 1964 to $23.7 million in 1986 (Answer Count I ¶ 14). Warehouse employees under Thames' supervision similarly grew in number from between 10 and 20 (changing with seasonal variations) in 1966 (Thames Dep. 6–8) to between 65 and 75 in 1984 (*id.* at 147). During that period the location of Maurice's warehouse changed several times.

Thames remained Warehouse Manager until August 6, 1984, when Maurice's then President Harold Olshansky ("Olshansky")

---

[1] Rule 56 principles impose on the summary judgment movant the burden of establishing the lack of a genuine issue of material fact (*Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986)). For that purpose this Court draws "all reasonable infer-ences, not every conceivable inference" in the light most favorable to the nonmovant—in this case Thames (*DeValk Lincoln Mercury, Inc. v. Ford Motor Co.,* 811 F.2d 326, 329 (7th Cir. 1987)). This statement of facts and the later text discussion conform to that requirement.

told Thames he was being demoted to the position of Assistant Manager, with Mark Podobinski ("Podobinski") being brought in from outside the company to serve as Manager. Maurice sets out a number of problems with Thames and the warehouse operation that assertedly caused the personnel change (Answer Count I ¶ 14):

1. Thames' failure to delegate responsibility;

2. Thames' failure to supervise and train employees properly as to packing technique;

3. the slow speed of processing and shipping orders;

4. the high number of "ticketing mistakes";

5. the large number of misdirected shipments;

6. dirt and disorganization in the warehouse; and

7. the lack of cooperation and teamwork between the warehouse and the sales operation.

Thames admits to an awareness of many of these problems (Thames Dep. 49–51, 157–60), but he denies all of them were his responsibility (P.Mem. 4 [2]) and insists some of the problems were due to inadequate operating facilities (Thames Dep. 55).

Podobinski worked for Maurice for only 2½ weeks before resigning. On his resignation Thames was redesignated as Warehouse Manager, but only on an interim basis (*id.* 60). On September 17, 1984 Maurice hired Brian Patterson, who managed the warehouse for approximately one month and then left the company. Maurice next hired Gerald Fornelli, who served as Warehouse Manager from November 26, 1984 until April 15, 1986. In every instance, the man Maurice hired as Manager was white and under the age of 40.

Throughout the brief revolving-door Warehouse Manager era and even during Fornelli's longer tenure in office, Thames insists he continued to perform essentially the same functions—except that he now had to report to someone besides Maurice's top management (*id.* 40–41). Thames identifies several changes in his activities resulting from his demotion:

1. He now shared an office with his assistant rather than having his own office (*id.* 36).

2. He spent all his time on the warehouse floor, while he had previously spent 15 to 20% of his time in his office (*id.* 39–40).

3. His daily contact with company management diminished, he was excluded from contact with outside visitors to the warehouse and he was now sent on "errand boy" jobs, which took him away from the warehouse (Thames Aff. 6 [3]).

Thames also says he was actually responsible for training his replacements (*id.* 3–4).

In April 1986—when Fornelli too resigned—Thames wrote to Maurice's new

---

**2.** This opinion will cite the parties' submissions this way:

1. Defendant's Brief in Support of its Motion for Summary Judgment: "D.Mem.—."

2. Plaintiff's Reply to Defendant's Motion for Summary Judgment: "P.Mem.—."

3. Defendant's Reply Brief in Support of its Motion for Summary Judgment: "D.R.Mem.—."

Neither party has complied with this District Court's General Rules 12(e) and 12(f). Those rules require the successive filing, in numbered paragraph format, of "a statement of material facts as to which the moving party contends there is no genuine issue" and "a concise 'statement of genuine issues' setting forth all material facts as to which it is contended there exists a genuine issue necessary to be litigated...." Maurice comes closest to fulfilling its obligation with its 7½ page "Statement of Uncontested Facts" (D.Mem. 1–8), while Thames makes no direct response except for a short "Statement of Facts" in his brief. Normally that would call for a flat-out denial of the motion, as General Rule 12(e) permits. This Court has not traveled that route only because of the fairly simple factual background here. But all counsel practicing in this District Court should be aware of those rules (not unique to this District) and the salutary purposes for which they were adopted. Not only does the required matching-up of issues provide a highlighting of material factual disputes (or their absence) for the court, but counsel's forced attention to such conceptual structuring of their cases should often stave off the filing of (or perhaps less often stave off the opposition to) a Rule 56 motion.

**3.** Thames' affidavit, like the other affidavits he submitted, does not contain paragraph numbers. All affidavit references are thus to the documents' page numbers.

President Jory Katlin ("Katlin"), applying for the Manager's position on a permanent basis.[4] Thames received no response to his letter. On June 13, 1986 Katlin told Thames that Ron Lisokar ("Lisokar") had been hired as Maurice's new Warehouse Manager. On that same day Thames resigned his job with Maurice.[5]

On October 22, 1986 Thames filed age and race discrimination charges with the Illinois Department of Human Rights and EEOC. Thames has satisfied the jurisdictional requirement for the present action: His Complaint allegations (which Maurice does not affirmatively challenge) say the EEOC informed him he was "free to sue" Maurice (Complaint Count I ¶ 4, Count II ¶ 6).

### Standards for Title VII and ADEA Claims

Thames' Complaint is not perfectly clear about which actions by Maurice he is attacking. Count I ¶ 22 appears to state a claim for constructive discharge, while Count I ¶ 23 can also be read to attack Maurice's demotion of, or failure to promote, Thames or both. Count II ¶ 19 states a claim under a constructive discharge theory alone. That possible imprecision need not be addressed, however, because Thames' submissions on the present motion assert only claims (under both Title VII and ADEA) for his constructive discharge by Maurice.

*Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 252–53, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1981) (citations omitted) summarized the familiar burden-shifting order of proof in discrimination cases:

> First, the plaintiff has the burden of proving by the preponderance of the evidence a prima facie case of discrimination. Second, if the plaintiff succeeds in proving the prima facie case, the burden shifts to the defendant "to articulate some legitimate, nondiscriminatory reason for the employee's rejection." ... Third, should the defendant carry this burden, the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.

Of course, in all this it must be remembered the "ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff" (*id.* at 253, 101 S.Ct. at 1093). That sequential process also applies to ADEA claims (*Oxman v. WLS-TV*, 846 F.2d 448 (7th Cir. 1988)).

4. Thames appended to his Complaint this typewritten letter to Katlin dated April 21, 1986:

   > As you know, I have been working for Maurice Sporting Goods since 1964. In 1966 I was promoted to warehouse manager and continued in that capacity until September of 1984.
   > At that time, I was demoted and another person hired from outside the company was placed in charge. Since then two other outside people have had that position. Each time I was asked to train and assist the person, since he knew nothing about the job.
   > The position is now open again due to the departure of Jerry Fornelli. I am applying for the position with title and salary comparable to those who have preceded me.
   > There is no question that I can do the job, as I have already demonstrated on the several occasions that I have been permitted to do it. The only question is whether you are willing to recognize my abilities and past contributions by promoting me to the position, I hope that your [sic] will.

   > I look forward to hearing from you.

   Thames' testimony refers to that letter and its content in detail (Thames Dep. 77–81). Maurice denies the typed letter is a copy of the one Katlin received, but it does admit Thames submitted a handwritten note to Katlin on April 21 (Answer Count I ¶ 18). Maurice also makes no comment whether the substance of the letter Thames attached to the Complaint varied from the letter Katlin received. Under the principles stated in n. 1, Thames' version must be accepted.

5. Maurice's Answer alleges Katlin tried to get Thames to change his mind and remain with Maurice (Answer Count I ¶ 22). Maurice also submits Thames Dep. 88, where he testified he "can't remember" if Katlin told him to take two or three weeks to think over his resignation. But Thames insists no one at Maurice ever told him not to quit in 1986 or that his job was being held open for his return (*id.* 83). Once again Thames is entitled to have his version of the events credited.

■ Thus the first order of business is to determine whether Thames has satisfied the prima facie case standards.[6] On that score *Henn v. National Geographic Society*, 819 F.2d 824, 828 (7th Cir.) (citations omitted), *cert. denied*, —— U.S. ——, 108 S.Ct. 454, 98 L.Ed.2d 394 (1987) has said:

> The "prima facie case" in the law of discrimination is a shorthand for the constellation of events that raises a suspicion of discrimination—enough so to require the employer to explain his conduct.

*Friedel v. City of Madison*, 832 F.2d 965, 972 (7th Cir.1987) has cautioned that "the elements of a *prima facie* case will vary depending upon the particular facts of various allegations of discrimination."

When a plaintiff alleges discriminatory firing (and constructive discharge, as the term implies, is a species of the same genus), the prima facie case has been described as containing four elements (*Mason v. Pierce*, 774 F.2d 825, 828 (7th Cir.1985)):

> (1) she belongs to the protected class, (2) she was qualified for the position, (3) she suffered an adverse employment decision, and (4) the employer sought to replace her.

ADEA involves essentially the same elements (*Williams v. Caterpillar Tractor Co.*, 770 F.2d 47, 49 (6th Cir.1985)).

To prevail at this point under either Title VII or ADEA, then, Thames need only demonstrate the existence of material facts that would lead to the reasonable inference he suffered an adverse employment decision.[7] It is solely on that point that the parties have joined battle for the present motion. And because (as already noted) both parties have limited themselves to the constructive-discharge facet of Maurice's conduct,[8] this opinion will of course do the same.

### Constructive Discharge

Constructive discharge occurs when an employer *"makes* an employee's working conditions so intolerable that the employee is forced into an involuntary resignation" (*Bartman v. Allis–Chalmers Corp.*, 799 F.2d 311, 314 (7th Cir.1986), *cert. denied*, —— U.S. ——, 107 S.Ct. 1304, 94 L.Ed.2d 160 (1987), quoting *Vaughn v. Pool Offshore Co.*, 683 F.2d 922, 926 (5th Cir.1982) (emphasis added in *Bartman* )).[9] On that score the question is whether "working conditions would have been so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign" (*Vaughn, id.*, quoting *Alicea Rosado v. Garcia Santiago*, 562 F.2d 114, 119 (1st Cir.1977)).[10]

**6.** *Burdine* is phrased in terms of burdens of proof at trial. On this summary judgment motion, though, Thames does not now have to carry the day. Rather he need only show the existence of any triable factual issue that, if ultimately resolved in his favor, would meet his burden at trial.

**7.** From the required pro-Thames-inference perspective, Thames has posed a material factual issue as to his qualifications for the job (see n. 12). Neither of the other two factors poses a problem either.

**8.** Just why Thames has done so is unclear. Of course the 300–day filing requirement of 29 U.S.C. § 626(d)(2) and 42 U.S.C. § 2000e–5(e) may prevent Thames from attacking Maurice's actions in 1984 and 1985 (though those actions, like Maurice's later conduct within the 300–day period, would appear admissible in evidence as to Maurice's intent or other issues; see n. 11). It may be that Thames' counsel considers any damages that might flow from a successful attack on Maurice's 1986 hiring decision would be minimal if Thames cannot also prevail on a constructive discharge argument. Any further

clarification of the matter can await future developments, however.

**9.** *Bartman* was an ADEA case, while *Vaughn* was under Title VII. Thus the same standard applies to both Thames' claims.

**10.** While some courts have added the requirement that the employer must have intentionally forced the employee to resign (see, e.g., *Bristow v. Daily Press, Inc.*, 770 F.2d 1251, 1255 (4th Cir.1985), *cert. denied*, 475 U.S. 1082, 106 S.Ct. 1461, 89 L.Ed.2d 718 (1986)), our Court of Appeals has not decided that issue (see *Henn*, 819 F.2d at 829; Comment, *Constructive Discharge Under Title VII and the ADEA*, 53 U.Chi.L.Rev. 561, 563–68 & n. 15 (1986)). This Court agrees with other District Court cases within this circuit holding the employer's intent is *not* a factor in establishing constructive discharge (*EEOC v. Miller Brewing Co.*, 650 F.Supp. 739, 744–46 (E.D.Wis.1986); *Bernstein v. Consolidated Foods Corp.*, 622 F.Supp. 1096, 1101 (N.D.Ill.1984); *Bailey v. Binyon*, 583 F.Supp. 923, 929 (N.D.Ill. 1984); accord, this Court's earlier opinion in *Scott v. Océ Industries, Inc.*, 536 F.Supp. 141, 148 (N.D.Ill.1982)).

Whether Thames was constructively discharged is a question not well-suited to disposition by summary judgment. As *Bernstein*, 622 F.Supp. at 1101 (citations omitted) noted:

> Application of this "reasonable person" test involves complex questions of fact, including, inter alia, the nature of the working conditions, their difficulty or unpleasantness, and what a reasonable person would or would not do under such conditions. Thus, the issue of whether there has been a constructive discharge normally should be left to the trier of fact.

*Bernstein, id.* did go on to acknowledge summary judgment can be appropriate when the employee's actions in resigning are "unreasonable as a matter of law" (see also *Bailey*, 583 F.Supp. at 929). That approach is impeccable, and this opinion therefore goes on to evaluate that issue— examining Thames' working conditions at Maurice and the actions taken against him in the light of all reasonable favorable inferences (see *Henn*, 819 F.2d at 830).

### Thames' Assertions

■■■■ Thames says he was forced to resign from his position at Maurice by a number of actions that made his continued employment intolerable. Though he is not always consistent about which actions led to his resignation, the most favorable view of his submissions identifies these factors underlying his decision:

1. Most obviously, Thames was demoted from the position of Warehouse Manager in 1984 and then passed over for the position on three separate occasions after that initial replacement.[11] Thames insists those actions were motivated by age and race discrimination, asserting he was not only eminently qualified for the job [12] but also in fact continued to perform the substance of the job because of the inexperience of his replacements (Thames Dep. 71).

2. Thames received no reply to his written April 1986 request to Katlin to be restored permanently to the position of Warehouse Manager (Thames Aff. 4).

3. Thames received no raise in 1985 for the first time in his 20 years with Maurice (*id.* 6). His bonus in 1985 was also cut by $3,000 without any explanation.

4. Thames also adduces a number of racially derogatory comments by Maurice's then President Olshansky, plus an Olshansky comment suggesting age discrimination:

    (a) Thames Aff. 4–5 swears:

    > Perhaps ten to twenty times, Harold Olshansky made remarks to Affiant, the gist of which were, that what is the world coming to—a black man running the warehouse. On another occasion Harold Olshansky said to Affiant that he had to figure out a way to beat Affiant out of that profit sharing money, that no black guy needs that kind of money.[13]

    (b) Thames Aff. 3 also attests that in August 1984, when he was notified of his demotion, Olshansky remarked Thames was "getting too old for the

---

11. Though any separate claims based on Maurice's 1984 and 1985 actions may be time-barred under Title VII and ADEA, those actions are nonetheless admissible as relevant evidence as to a claimed constructive discharge of Thames in 1986 (*Downey v. Southern Natural Gas Co.,* 649 F.2d 302, 305 (5th Cir.1981)).

12. Maurice certainly disputes whether Thames remained qualified to handle the position of Warehouse Manager permanently (Answer Count I ¶¶ 14–15). But Thames' submissions, especially a series of affidavits by people he worked with, establish at least a disputed issue of fact over his competence. This opinion will not pause to address—especially because Maurice has not—the sometimes knotty question of the extent to which such other people's opinions are admissible.

13. [Footnote by this Court] Maurice counters that Thames testified, in response to the question whether Maurice management had ever made racially derogatory comments in his presence (Thames Dep. 42):

    Not that meant anything.

    This inconsistency between Thames' affidavit (or at least the inference that might arguably be drawn from it) and his deposition testimony cannot be resolved on summary judgment. For now Thames gets the benefit of the doubt.

job" and also pointed out Thames' grey hair.[14]

5. Finally, Thames Aff. 6 says other factors pressuring him to resign from the end of 1985 until he did so included these:

>(a) Management people, with whom Thames had previously had a good relationship, began to avoid him.

>(b) He was sent on "errand boy" jobs previously beneath him.

>(c) Katlin never introduced him to warehouse visitors, as had previously been the case.

Thames maintains that the congeries of these matters at least entitles him to reach the trier of fact with his constructive discharge claim (P.Mem. 16).[15] Simply reciting that laundry list would seem to this Court to be enough, but this opinion will go on to explain briefly why those matters do suffice to create a disputed issue of material fact precluding summary judgment.

### Evaluation of Thames' Assertions

There are few bright line rules to illustrate when a claim of constructive discharge is insufficient as a matter of law. Employees violate the "reasonable person" standard if they resign based solely on unequal pay (*Heagney v. University of Washington*, 642 F.2d 1157, 1166 (9th Cir. 1981)), an ordinary isolated act of discrimination (*Bailey*, 583 F.Supp. at 929) or a simple denial of a promotion (*Junior v. Texaco, Inc.*, 688 F.2d 377, 378–80 (5th Cir.1982); see also *Miller Brewing*, 650 F.Supp. at 748)).[16] Beyond those (or perhaps comparably) simple categories, the line separating sufficient from insufficient claims of constructive discharge is less easily defined.

■ To establish constructive discharge, Thames must allege "aggravating factors" beyond the fact of adverse treatment—of discrimination—on the basis of his race or age or both (see *Clark v. Marsh*, 665 F.2d 1168, 1174 (D.C.Cir.1981); see also *Bailey*, 583 F.Supp. at 929–30). Absent such aggravation of the situation, Thames would not be justified in resigning rather than fighting the discrimination while sticking it out at Maurice (see *Bourque v. Powell Electrical Manufacturing Co.*, 617 F.2d 61, 66 (5th Cir.1980) ("society and the policies underlying Title VII will be best served if, wherever possible, unlawful discrimination is attacked within the context of existing employment relationships")). Such a standard is consistent with (though of course not identical to) the requirement in discrimination suits that a plaintiff mitigate his or her damages.

---

14. Thames Aff. 5 also relates the comments of two of the men hired over him as Warehouse Manager that they could see no reason other than race for his demotion. But such statements would be inadmissible at trial as hearsay (this Court would not view Fed.R.Evid. 801(d)(2)(D) as applicable), nor would this Court permit their introduction as lay-witness opinion under Fed.R.Evid. 701. Thames also offers the affidavit of Maurice's former financial vice-president Walter Patelski ("Patelski") stating that Maurice executives made racially pejorative comments about Thames and told Patelski he could not hire more than one or two blacks for the company (Patelski Aff. 1). That evidence is surely relevant on the issue of discriminatory intent. But on the current question of constructive discharge, Thames has not said Patelski informed him of the statements before Thames resigned from the company, and nothing suggests that as a fair inference. Thus the statements cannot be considered as factors bearing on Thames' perception of the intolerability of his working conditions.

15. D.Mem. 14 tries to limit the factors that led Thames to resign to the shorter list Thames identified during his deposition (Dep. 70–74):

>1. He was angry at being passed over for younger, less qualified white managers.
>2. He was uncomfortable being "second in command."
>3. He had been questioned by the Internal Revenue Service as a "prime suspect" in an investigation of Maurice.

Although Thames can certainly be cross-examined at trial about his omission during the deposition of other factors he later cited in his affidavit, once again this Court will accept for now his more detailed explanation of why he felt compelled to resign.

16. P.Mem. 15 disputes whether a denial of promotion is insufficient by itself to constitute discharge unless it is also established the plaintiff was unqualified for the promotion. That question need not be tackled, because Thames' complaints extend beyond the denial of a promotion.

This is not the trial stage. Could a reasonable factfinder view the conditions to which Thames was subjected as constituting a constructive discharge? To be sure, the working conditions Thames portrays are not as intolerable as those of a pregnant employee who was reassigned to a job requiring heavy manual labor (*Meyer v. Brown & Root Construction Co.*, 661 F.2d 369, 371–72 (5th Cir.1981) or those of a former chief of detectives who was transferred to uniform duty and given a windowless former storage closet as an office, with nothing to do but contemplate his navel (*Parrett v. City of Connersville*, 737 F.2d 690, 693–94 (7th Cir.1984), *cert. dismissed*, 469 U.S. 1145, 105 S.Ct. 828, 83 L.Ed.2d 820 (1985)).

But the conditions with which Thames was presented, though they did involve some petty and insubstantial deprivations as well as more serious ones, are sufficient at this stage (cf. *Miller Brewing*, 650 F.Supp. at 746–48). To repeat once more what has already been set out in the "Facts" and "Thames' Assertions" sections of this opinion would be (just as "To gild refined gold, to paint the lily") what Shakespeare termed "wasteful and ridiculous excess." [17]

■■■ Moreover, a continuing pattern of discriminatory conduct can be enough to establish the aggravating circumstances justifying Thames' resignation (*Nolan v. Cleland*, 686 F.2d 806, 813–14 (9th Cir. 1981)). Thames states a pattern of his repeated enforced subordination to a whole series of younger and inexperienced people (whom he was forced to train, to add insult to injury), beginning with his initial demotion in 1984 and continuing through the hiring of Lisokar in 1986. If those charges are borne out, the statement in *Clark*, 665 F.2d at 1175–76 would apply with equal force here:

17. Though *King John* has not survived much in performance, a good many of its felicitous phrases have entered the language (in this instance usually in the inaccurate form of "gilding the lily").

18. [Footnote by this Court] This seems the judicial version of the bartender's sage advice:

We find that the historic discrimination to which plaintiff had been subject, her repeated but futile attempts to obtain relief from that discrimination, and the predictable humiliation and loss of prestige accompanying her failure to obtain this particular position constitute the "aggravating factors" required by *Bourque*.[18]

It may be that on hearing all the evidence, the trier of fact may conclude Thames' situation was tolerable and a "reasonable person in [his] shoes would not have felt compelled to resign" (*Bourque*, 617 F.2d at 65). But that is not the test today. Thames has earned the right to bring his constructive discharge claim to trial.

*Conclusion*

Maurice's motion for summary judgment is denied. This action is set for a status hearing May 25, 1988 at 9 a.m., at which time the parties should be prepared to discuss what further steps are necessary to prepare the case for trial.

If three people tell you you're drunk, you might as well lie down.

More seriously, an employee of Thames' seniority could well (and reasonably) consider his repeated subjection to such demeaning treatment, with no end in sight—remember his version must be credited for now—an intolerable work environment.