**Jack ENGLISH, Sandra Rushing, and Demona Ross, Plaintiffs,**

v.

**GENERAL DEVELOPMENT CORPORATION and Gina Battaglia, Defendants.**

No. 88 C 9735.

United States District Court, N.D. Illinois, E.D.

Jan. 31, 1990.

**306**

Jeffrey L. Taren, Chicago, Ill., for plaintiffs.

James W. Gladden, Jr. and David B. Ritter, Chicago, Ill., for defendants.

## MEMORANDUM OPINION

BRIAN BARNETT DUFF, District Judge.

General Development Corporation and Gina Battaglia have moved for summary judgment on Demona Ross's claims against them under 42 U.S.C. § 1981 (1982).[1] Ross is a black female; she seeks to recover under § 1981 for (1) the defendants' constructive discharge of her, (2) their retaliation against her for complaining about their racial discrimination, (3) their policy of not recruiting or entering into employment contracts with blacks, (4) their refusal to enter into a contractual relationship with her on a nondiscriminatory basis, and (5) their policy of not marketing General Development properties to blacks. See Amended Complaint, ¶¶ 1, 4, 11, 16.

General Development sells Florida residential real estate. It employs several layers of sales personnel. The entry-level sales position is marketing representative. Marketing representatives work on teams headed by a marketing manager. The marketing representative's sole duty is to "develop" potential customers. This means contacting prospective buyers, arranging for and making a sales presentation, and "closing" the sale. General Development compensates its marketing representatives strictly on a commission basis.

General Development hired Ross in late May 1987. Like many other marketing representatives, Ross had no prior experience in selling real estate. Ross was hired shortly after interviewing with a co-plaintiff in this case, Sandra Rushing. Rushing had a unique position at General Development, that of "Recruiting Manager" on a sales team headed by another co-plaintiff, Jack English. At the time Ross joined General Development, English and Rushing were resisting an alleged company policy against hiring or marketing to blacks.

Despite the company's alleged policy, Ross was hired and attended a three-day General Development training program with approximately twenty other marketing representatives. After completing the program, Ross met with English. Together they prepared a list of persons (a "marketing profile") whom Ross was to contact for making her sales pitch. Ross worked out of General Development's Chicago office with other marketing representatives. Like any representative, Ross had a desk, a telephone, and access to a secretary.

Having prepared her marketing profile, Ross began to schedule sales presentations. Ross set up four appointments, only to experience problems. The first appointment was cancelled by the customer. When the customer called to reschedule, defendant Battaglia, a Senior Marketing Manager who was English's superior, allegedly told Ross not to bother because "those type of people once they cancel ... don't show up for appointments." As for

---

1. Unless indicated, the facts in this opinion are undisputed and taken largely from the defendants' Local Rule 12(*l*) Statement. The court has recognized a factual dispute only where Ross has challenged the defendants' facts by way of her Local Rule 12(m) Statement, and has supported her factual contentions with citations to the record. Where there is a factual dispute, the court has taken Ross's version as true for purposes of this motion.

the other meetings, Battaglia told Ross that she could not keep them, since no marketing manager would be available to help Ross make the sale. With respect to one of these appointments, one with her dentist which Ross had tried to arrange at the dentist's office, Battaglia allegedly said, "Those types of people, they try to put a ring in your nose and pull you by it."

Battaglia allegedly blocked Ross's other attempts to make appointments and solicit customers by mail.[2] Soon thereafter English and Rushing quit General Development, allegedly in protest over the company's discriminatory policies. Just prior to his resignation English called Ross and informed her of his decision. English told Ross that he was quitting because Battaglia was forcing him to discriminate against blacks. Prior to this time Ross had not suspected that she had been the victim of discrimination.

Ross continued working for General Development for close to a week after her conversation with English. She felt during this time "like a sore thumb." Ross testifies she felt this way because "everyone already knew about what happened" with English's departure. She suggests that she believed that other employees would suspect her of having caused "all this trouble," although none of her co-workers were mean to her. All that Ross observed was reluctance among these workers to include her in conversations. One morning in late June 1987, while Ross was on her way to work, she simply "turned around and went back home and never came back." Ross Deposition 80, 105–06. Ross did not discuss her problems or those of English with anyone at General Development until September 1, 1987.

■ Having considered the undisputed facts and the remaining contested allegations, the court can grant summary judgment to the defendants on some of Ross's § 1981 claims. First, the defendants did not constructively discharge Ross. "An

employer constructively discharges an employee only if it '*makes* an employee's working conditions so intolerable that the employee is forced into an involuntary resignation....' " *Bartman v. Allis–Chalmers Corp.*, 799 F.2d 311, 314 (7th Cir. 1986), quoting *Vaughn v. Pool Offshore Co.*, 683 F.2d 922, 926 (5th Cir.1982) (emphasis in *Bartman*). " 'An employee must seek legal redress while remaining in his or her job unless confronted with an "aggravated situation" beyond "ordinary" discrimination.' " *Brooms v. Regal Tube Co.*, 881 F.2d 412, 423 (7th Cir.1989), quoting *Bailey v. Binyon*, 583 F.Supp. 923, 929 (N.D.Ill.1984).

Taking everything that Ross says as true, the defendants did not make life "intolerable" for her. Ross gives only two reasons for quitting. She says first that she left because *she* felt that she was the reason for English and Rushing's departure. The defendants did not tell her this—she merely assumed it. Ross has brought forth no facts which demonstrate that any employee in her position would make this assumption. Moreover, even if any employee in her position would have assumed what she did, it is not reasonable for an employee to quit for this reason. As noted by the Seventh Circuit in *Brooms,* it is the employee's duty to try to work things out before leaving. Ross made no such effort.

Ross's second reason for leaving was that she felt that her co-workers were not as friendly towards her once English and Rushing had left General Development. Ross again fails to ascribe her co-workers' attitudes to General Development. This aside, the court cannot say that her co-workers' reactions made working at General Development intolerable. Their conduct does not come close to that seen in the cases in this circuit and district which have found constructive discharge. See *id.* (plaintiff constructively discharged after employer repeatedly subjected her to offensive racial and sexual slurs, sexual ad-

---

**2.** Ross testifies that Battaglia told her not to call on friends of Ross's father because Ross was not "ready" to call on them. Battaglia instructed Ross not to send out a mailing to persons whom Ross believed were black Muslims because Battaglia thought the mailing was illegal. Ross has not produced any evidence that Battaglia's given reasons were incorrect.

vances, and physical assaults, even after plaintiff had filed complaints); *Thames v. Maurice Sporting Goods, Inc.*, 686 F.Supp. 208 (N.D.Ill.1988) (blatant, continuing pattern of discrimination can aggravate circumstances and justify resignation). Minor annoyances, or even the "silent treatment," do not justify a resignation in themselves. See *Henn v. National Geographic Soc.*, 819 F.2d 824, 829–30 (7th Cir.1987); *Miller v. State of Ill.*, 681 F.Supp. 538, 544 (N.D.Ill.1988).

■ Ross quit voluntarily, and thus may not recover under § 1981 for constructive discharge.[3] She also may not recover for the defendants' alleged policy of not hiring blacks, as Ross has not established harm to her as a result of this policy. Unlike those persons whom General Development did not hire as a result of its alleged policy[4], Ross got a job with General Development. Ross also was not in the position of English and Rushing, her co-plaintiffs. English and Rushing allegedly received commissions based on the sales performance of persons whom they supervised, which gives them an interest which they can protect under § 1981. See *English v. General Development Corp.*, 717 F.Supp. 628, 630 (N.D.Ill.1989). By contrast, Ross has not shown that she had a monetary interest in having blacks join her sales team. She thus cannot recover from the defendants under § 1981 on account of their alleged policy of not hiring blacks.

■ The fourth and fifth aspects of Ross's § 1981 claim are that the defendants were unwilling to contract with her and with black customers on a nondiscriminatory basis. These assertions go to the very heart of § 1981, which by its terms gives persons "the same right ... to make and enforce contracts ... as is enjoyed by white citizens...." The Supreme Court's decision in *Patterson v. McLean Credit Union*, —— U.S. ——, 109 S.Ct. 2363, 105 L.Ed.2d 132 (1989), significantly limited the protection previously thought to be available under this statute. In light of *Patterson*, this court has held that Ross would have a claim under § 1981 if she could demonstrate which provisions of her employment contract discriminated on the basis of race, and link "the defendants' conduct at the time they hired her [to] the harms she suffered." *English*, 717 F.Supp. at 632. The court explained, however, that two types of persons could challenge racial discrimination under § 1981, provided that the person could tie the discrimination to the making or enforcement of a contract. One category of plaintiffs comprises the "direct" victims of discrimination: those persons who themselves could not enter into a nondiscriminatory contract. The second category comprises the "indirect" victims of discrimination: those persons who suffer a loss because of discrimination directed at others. See *English*, 717 F.Supp. at 630, 633–34.

Ross claims that she fits into both categories. She is half correct. Even when pressed, Ross never states what term of her employment contract differed from that of her fellow marketing representatives. She implies that it could have been a hidden provision in her contract that she could not sell to blacks. Strangely enough, Ross cannot claim *direct* discrimination on account of this clause, even if her contract had such a prohibition. Throughout Ross's version of the facts, she insists that General Development had a prohibition against selling to blacks in *every* employment contract. Ross never alleges that she was prohibited from selling properties to blacks, while whites were permitted to do so. But that is what direct discrimination would mean in a case like this one. Ironically, that General Development did not discriminate when it came to discrimination means that Ross cannot prevail on the fourth aspect of her § 1981 claim.

---

3. Similarly, Ross cannot claim that she was fired in retaliation for protesting against General Development's discriminatory policies. It is undisputed that Ross first protested against General Development's policies over two months *after* she quit the company.

4. Some of these persons have joined a class action against the defendants which is pending before another judge of this district.

■ This leaves Ross with the fifth aspect of her § 1981 claim, that she indirectly suffered from the defendants' refusal to sell to black customers. The defendants concede that they compensated Ross solely on the basis of commissions. It thus follows that by prohibiting Ross from selling to blacks, the defendants limited the market available to Ross for sales of General Development properties. Ross thus had a financial interest in seeing the end of the defendants' racial discrimination while she was working for General Development. This interest is similar to that alleged by co-plaintiffs English and Rushing, and one which § 1981 protects.

The court grants General Development and Gina Battaglia summary judgment on the first through fourth aspects of Ross's claims in Count 1 of her Amended Complaint. The court denies summary judgment on Ross's challenge in Count 1 to the defendants' alleged policy of not selling properties to blacks.