Phyllis CLINE, Plaintiff,

v.

GENERAL ELECTRIC CAPITAL AUTO LEASE, INC., f/k/a General Electric Credit Auto Lease, Inc., an Illinois Corporation; and Jerome Burd, Individually and as an agent for and on behalf of General Electric Capital Auto Lease, Inc., Defendants.

No. 89 C 6019.

United States District Court, N.D. Illinois, E.D.

Jan. 31, 1991.

---

Mary C. Martin, Law Offices of Mary C. Martin, Chtd., and David W. Andich, Chicago, Ill., for plaintiff.

Ellen E. McLaughlin, Robert J. Mignin, Kathleen M. Paravola, Eugene G. Bruno, Seyfarth, Shaw, Fairweather & Geraldson, Chicago, Ill., for defendants.

## MEMORANDUM OPINION

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

BRIAN BARNETT DUFF, District Judge.

This suit [1] came before the court for trial without a jury and the trial was completed

---

**1.** The amended complaint consisted of three counts. This court dismissed Count 1 on defendants' motion for summary judgment, *Cline v.*

on November 7, 1990. The court has heard the evidence and has considered the testimony, exhibits, memoranda of law, and arguments of counsel. Now fully advised in this matter, the full trial having been concluded, the court finds these facts:

### 1. Background

1. General Electric Capital Auto Lease, Inc. (GECAL) is a corporation doing business in and organized under the laws of the State of Illinois, with its principal place of business in Barrington, Illinois.

2. Phyllis Cline resides in Hoffman Estates, Illinois. She worked for GECAL from August, 1987 through May, 1988.

3. Jerome Burd resides in Cary, Illinois and has worked for GECAL in various capacities since January, 1977. Between May, 1981 and February, 1989, Mr. Burd was GECAL's National Collections Manager.

4. GECAL was, at all relevant times, an employer as defined by 42 U.S.C. § 2000e.

### 2. Ms. Cline's Employment at GECAL

5. Marilyn Sabounghi, Ms. Cline's neighbor, referred her to the job. Ms. Sabounghi also worked in the Collections Department. Ms. Cline interviewed with Mr. Burd, the Area Collection Manager, Karen Sweeney and Madelaine Ewing, another collector in the department.

6. Mr. Burd and Ms. Sweeney both told Ms. Cline that the work in the Collections Department, requesting payments from people who had become delinquent on their auto leases, was stressful.

7. Ms. Cline began working for GECAL as a regular, full-time 30–day collector in August, 1987. Her starting salary was $15,500 per year.

8. During her tenure with GECAL, Ms. Cline had a series of immediate supervisors. They were: Ms. Sweeney, George Benson, Ann Philbin and Marilyn Saboun-

ghi. Those supervisors, referred to as "Area Collections Managers", reported to Mr. Burd. Mr. Burd, in turn, reported to Rick Weissner, the "Receivable Controls Manager". Mr. Weissner reported to the Vice President of Operations, who reported, finally, to the President, James Giacomini.

9. Collectors, including Ms. Cline, were responsible for calling lessees who were delinquent in making payments on their accounts. Some of those lessees would use abusive and profane language to the collectors, including Ms. Cline. The collectors' performance was measured by the number (or dollars) of delinquent accounts they collected.

10. Ms. Cline often worked overtime, and, true to her co-workers' predictions, the work was stressful.

11. In January, 1988, Ms. Cline received a 3.6% merit increase ($558/year).

12. In April, 1988, Ms. Cline received another merit increase, this time for 4.5%, or $725 per year.

13. Ms. Cline received a "fully satisfactory" performance appraisal, which was approved by Mr. Burd, on March 9, 1988 (Joint Exhibit 4).

14. She also received a formal written performance appraisal on March 24, 1988 (Joint Exhibit 5). Mr. Burd approved her overall "satisfactory" appraisal.

15. Ms. Cline went on medical disability leave on May 17, 1988 and never returned to work at GECAL.

16. Prior to her employment with GECAL, Ms. Cline had been consistently employed since 1971.

### 3. Mr. Burd's Treatment of Department Employees

17. Shortly after Ms. Cline began working at GECAL, Mr. Burd began calling her "Filly".[2] Ms. Cline objected to the 'nickname' and consistently asked Mr. Burd to

*General Electric Credit Auto Lease, Inc.,* 748 F.Supp. 650 (N.D.Ill.1990).

**2.** The defendants represent the 'nickname' as "Philly". For the reasons discussed below, this court finds the distinction irrelevant. It will use Ms. Cline's designation in this opinion, as it did in its opinion on the motion for summary judgment, solely for the sake of simplicity.

stop using it. One day Mr. Burd acquiesced. He announced to all the workers in Ms. Cline's department that everyone should stop calling Ms. Cline "Filly." Instead, Mr. Burd told the department, they were to call her "Syphilis, the gift that keeps on giving." From then on Mr. Burd called Ms. Cline "Syphilis."

18. Mr. Weissner, Mr. Burd's supervisor, observed this incident, but did not respond to it.

19. At least one female co-worker called Ms. Cline "Syphilis", and the name appears in a note apparently intended to be friendly which some of Ms. Cline's co-workers sent to her while she was on her medical leave from GECAL.

20. Mr. Burd called Ms. Cline "Syphilis" when he telephoned her to monitor her progress during her medical leave.

21. Ms. Cline and other workers in her department both saw and heard Mr. Burd yell at workers in the department about work related matters.

22. The evidence at trial demonstrated, however, that Ms. Cline was the subject of particular cruelty at Mr. Burd's hands. Aside from the derogatory nicknames he insisted on using to refer to her, Mr. Burd:

a. Hit Ms. Cline in the arm in January, 1988. The blow was strong enough to leave a mark on Ms. Cline's arm for several hours.

b. Hit Ms. Cline on the head with a file.

c. Speculated about Ms. Cline's sexual relationship with her husband, including asking whether she and her husband were "getting it on" or whether she was "getting enough at home".

d. Referred to Ms. Cline's husband (named "Bob") as "Billy–Bob", despite Ms. Cline's repeated requests that he not do so.

e. Once yelled at Ms. Cline to "sit your ass back down" while Ms. Cline was on the phone with a lessee.

f. Made derogatory comments about Ms. Cline's dress and appearance, including ordering her not to wear a particular dress to work because he hated the color, telling her that she looked like a streetwalker, and telling her that her shoes were the ugliest he had ever seen.

g. Monitored the time she spent in the restroom, told her she could spend no more than five minutes there, and banged on the door when he decided she had been there long enough.

h. Refused to believe Ms. Cline when she told him she had attempted to call in when car trouble caused her to be late to work one day. Mr. Burd docked Ms. Cline's pay for the time she missed, despite the fact that he himself checked the line she had tried to call on, and found that it was not working.

23. Ms. Cline, as any reasonable person would have been, was embarrassed and humiliated by Mr. Burd's treatment of her.

24. The evidence at trial also demonstrated that Mr. Burd treated other women in the department with similar derision:

a. He made fun of Maddie Ewing's large breasts, her dress and her appearance, all in front of other department employees.

b. Mr. Burd hit Ms. Ewing on the head with a metal pen more than once, called her "short shit" and other derogatory names.

c. Mr. Burd obtained an unauthorized personal credit report on Ms. Ewing. He then told her she had too many credit cards and ordered her to turn her credit cards over to him. He cut some of them up, and kept others.

d. Mr. Burd took Ms. Ewing's checkbook, paid her bills, and put her on an allowance. When Ms. Ewing objected, Mr. Burd responded to her in an obscene fashion, indicating that he would not relinquish control over her personal finances.

e. Mr. Burd frequently pinched Marilyn Sabounghi. Several times the pinches were hard enough to leave bruises for days. He repeatedly hit her with a ruler, as "punishment" for biting her nails or reaching for a cigarette.

f. Mr. Burd told Ms. Sabounghi that her legs looked diseased. He called her a "Jewish Princess" or "Jewish American Princess" more than once.

g. He searched her purse and desk, without authority, several times. When he found cigarettes, he crumbled them over her desk.

h. On October 7, 1988, Mr. Burd grabbed Ms. Sabounghi's arm, twisted it, and blocked her from leaving her office.

i. Karen Sweeney complained to Human Resources on November 6, 1987, that Mr. Burd twisted her arm with enough force to leave a mark. Ms. Sweeney was fired a month later.

j. Mr. Burd hit Ann Philbin on her hand with a ruler, once when she reached for a cigarette and once to punish her for omitting the middle initial of a lessee's name. On the latter occasion, Mr. Burd told Ms. Philbin "if you do it again, I'll hit you harder."

k. Mr. Burd called other women in the department names like "fat ass", "dyke" and "dragon lady".

25. Several of the women in Mr. Burd's department gave him Christmas and/or birthday gifts. Ms. Cline gave Mr. Burd a "cross-stitch" wall hanging which said "This Place Is A Zoo" for Christmas, 1987 (about four months after she began working for GECAL).

26. Some of the women in the department called Mr. Burd "General Burd", "Burd–Man" and "PIA" (pain-in-the-ass).

27. None of these women, except Ms. Sweeney, complained about Mr. Burd to GECAL's Human Resources department. The women sometimes responded to Mr. Burd's comments with laughter, but more often communicated to him that his behavior did not please them.

28. Ms. Cline complained frequently to Mr. Burd and once to Ann Philbin when Ms. Philbin was her immediate supervisor about Mr. Burd's treatment of her. She received no relief and did not press her complaint because she was convinced that Mr. Burd's superiors were aware of, and condoned his behavior (see Findings of Fact 58–72).

29. Based on Mr. Burd's general behavior, as well as her knowledge of what had happened to Ms. Sweeney, Ms. Cline reasonably feared retaliation by Mr. Burd for her complaints.

30. None of the evidence introduced at trial suggested that the terms and conditions of Ms. Cline's employment were conditioned upon her granting sexual favors or engaging in any sexual conduct or behavior with Mr. Burd or any other GECAL manager, supervisor or employee.

31. There was evidence that at least one male employee in Mr. Burd's department, an African American man named George Benson, was a frequent target of Mr. Burd's ire.

a. Noticing that Mr. Benson had changed his clothes after work, Mr. Burd asked him if he was going to a minstrel show.

b. Mr. Burd told Mr. Benson that he didn't know "you people" could blush.

c. Mr. Burd called Mr. Benson's shoes "pimp" shoes.

d. Mr. Burd told Ms. Sabounghi that, despite an improvement in Mr. Benson's performance, he wanted to get rid of "the nigger" because "I hate niggers".

32. White men in Mr. Burd's department were not subject to the same treatment as the women and Mr. Benson. Mr. Burd did not hit, pinch or grab men; he did not interfere with their personal finances. He did not yell at them and his comments to them were not as cutting, sarcastic or pervasive as those he directed toward the women in his department.

33. Nonetheless, Mr. Burd's treatment of his white male employees could hardly be described as "kind" or "enlightened".

a. He told Jim Anderson to clean up his work area, complaining it was a "pig sty". He also told Mr. Anderson to wash his clothes and bathe. On one occasion he cleaned Mr. Anderson's phone and removed gum from inside his desk drawer.

b. Mr. Burd told Jim Dvonch to get a haircut and make himself more "presentable".

c. Mr. Burd called Ed McClory "Baby Huey" and told him once that his clothes looked like he had slept in them.

### 4. Ms. Cline's Medical Problems

34. Before she began working at GE-CAL, Ms. Cline was diagnosed as having Temporal Mandibular Joint Dysfunction (TMJ) in her left jaw joint.

35. TMJ's main symptom is pain in the jaw joint. The pain can be intense and sometimes may feel similar to the pain of a toothache.

36. Ms. Cline had a TMJ attack in her left jaw joint in 1987. She had been experiencing some work-related stress at that time, due to the glitches in a new computer system installed by her employer.

37. In June, 1987, Ms. Cline visited a dentist, Dr. Luzwick, about the pain she was experiencing. He fitted her with a mouth apparatus to be worn at night.

38. The mouth apparatus is a common treatment for TMJ, as it prevents the patient from grinding, or bearing down, with enough pressure to cause the joint dysfunction.

39. After a few adjustments (completed by December, 1987), the mouth apparatus was successful in minimizing or alleviating Ms. Cline's jaw pain.

40. Dr. Luzwick also suspected that Ms. Cline was suffering from "tic douloureux", a facial neuralgia. Dr. Luzwick's suspicion was based upon Ms. Cline's complaints of severe facial pain on the left side of her face, which could be aggravated by merely touching the affected area.

41. In the past thirty years, Dr. Luzwick has treated between three and four hundred patients for TMJ. He has treated five patients for tic douloureux.

42. Ms. Cline next consulted Dr. Luzwick on May 17, 1988, when she again complained of pain in her face and jaw. Dr. Luzwick prescribed valium and codeine to relax Ms. Cline's facial muscles and relieve the pain. He observed that Ms. Cline's mouth apparatus was "broken up", apparently because of the force with which she had been "bearing down" on it. He rebuilt it and fit her for a second, "upper mouth" appliance to be used with her first appliance.

43. It was Dr. Luzwick's opinion, which this court finds credible based both upon Dr. Luzwick's extensive experience in treating TMJ, his testimony and the totality of his demeanor, that Ms. Cline's TMJ was caused by stress.

44. On Dr. Luzwick's recommendation, Ms. Cline had three abscessed teeth removed. Dr. Luzwick's opinion, which, again, this court finds credible, is that stress caused Ms. Cline to "bear down" with such force that she loosened those teeth from their foundations, damaging the nearby nerves. The teeth consequently became abscessed.

45. Dr. Luzwick believes (and this court credits that belief) that tic douloureux is related to TMJ—specifically, that the muscle spasms caused by TMJ may precipitate tic douloureux.

46. On June 2, 1988, Dr. Luzwick certified that Ms. Cline was unable to work, and would require two months of therapy (Joint Exhibit 12). He again certified that Ms. Cline was unable to work in November, 1988 (Plaintiff's Exhibit 11). He specifically stated: "She cannot go back to work for a long time. Because of the stress and tension of her present job and the surroundings of the department, she is still having many problems."

47. In January, 1989, Ms. Cline consulted a neurologist, Dr. Bickshorn. His diagnosis was that Ms. Cline was suffering from tic douloureux, and he prescribed Tegretol to treat her facial pain. He also certified that she was unable to work due to the pain she was experiencing (Joint Exhibit 12).

48. The Tegretol reduced or eliminated Ms. Cline's facial pain, but it also caused certain side-effects, including dizziness, nausea, ringing in the ears, high fever and lethargy.

49. A lower dose of Tegretol mitigated the side-effects, but also precipitated a recurrence of Ms. Cline's facial pain.

50. Ms. Cline described her facial pain as "sharp, needle-like" pain, which she felt in the area defined by her left nostril, the

left corner of her lip, and the middle of her left cheekbone.

51. Between January and May, 1989, Dr. Bickshorn tried various medications to relieve the pain caused by Ms. Cline's tic douloureux, but without success.

52. In June, 1989, Ms. Cline began treatment at the Loyola Medical Practice Plan with Dr. Owen Reichman. By starting at a low dose of Tegretol and gradually increasing the dosage over the period of about a year, Ms. Cline and Dr. Reichman were able to eventually eliminate both the pain from tic douloureux and the side effects from the Tegretol.

### 5. Ms. Cline's Medical Leave

53. Ms. Cline had not returned or attempted to return to work at GECAL during the time she was receiving treatment for TMJ and tic douloureux.

54. In May, 1990 she began to work part-time for her husband's vacuum cleaner repair business. She also started her own floral arrangement business. Her income from these endeavors is about equal to the salary she was earning when she left GECAL on medical leave.

55. Between June and December, 1988, Ms. Cline was on "short-term disability leave".

56. Under the terms of the "short-term disability leave" policy, Ms. Cline received 60% of her salary for the first twenty-six weeks of her leave of absence. The policy also required her to report her health status to GECAL once a week.

57. For the first few weeks of her leave, Ms. Cline reported directly to Mr. Burd. During this time, he continued to call her "Syphilis".

58. Ms. Cline next reported to Ms. Sabounghi through October, 1988, when Ms. Sabounghi left GECAL. Mr. Burd would still occasionally talk with Ms. Cline after she spoke with Ms. Sabounghi. He continued to occasionally call her "Syphilis".

59. Between October, 1988 and December, 1988, Mr. Burd again became Ms. Cline's direct contact regarding her health status. During these conversations he continued to call her "Syphilis" and yelled at her about whether or why she left telephone messages.

### 6. GECAL Policies and Knowledge of Mr. Burd's Behavior

60. Since sometime before Ms. Cline began working for GECAL, the company had in effect a written "open-door" policy allowing employees to consult upper levels of management or Employee Relations if they have concerns regarding working conditions, pay, benefits, job performance, or how they are being managed. Ms. Cline was aware of this policy.

61. Some employees used the policy to complain about working conditions and about their managers.

62. Since March, 1988, the Company has had in effect a written policy against sexual harassment. The policy statement explicitly prohibits sexual harassment and instructs employees to report any incidents of sexual harassment to upper levels of management or to Human Resources. Ms. Cline never received notice of this policy.

63. Finally, GECAL had in effect a program called "Skip Level Meetings". The program provided for regular annual meetings between employees at the same grade level and a manager one or more levels above the employees' immediate manager. The manager chairing the meeting selects the employees who will attend. Ms. Cline was never invited to a "Skip Level Meeting".

64. Mr. Rick Weissner was Jerry Burd's immediate supervisor. His office was located in close proximity to Mr. Burd's department. He could not have been unaware of at least some of Mr. Burd's behavior. He certainly heard Mr. Burd yell at his employees, and there was evidence that he saw some of the physical abuse Mr. Burd leveled against the women in the department.

65. Since at least 1986, GECAL's Human Resources Department received several complaints from male and female employees about Mr. Burd's treatment of the employees he supervised.

66. A February, 1986 internal GECAL report expressed concerns about Mr. Burd's management of the Collection Unit. It called for a "high priority" investigation to begin "as soon as possible".

67. In December, 1988 Marcia Knorr, one of the employees Mr. Burd supervised, sent a written complaint to President James Giacomini. It noted, among other things, that Mr. Burd called Ms. Cline "Syphilis". Ms. Knorr also stated that "I am not certain I can call him totally misogynistic, but I never saw, never heard, ... of more than one or two of his diatribes being directed toward the males in the department." Mr. Giacomini directed Human Resources to conduct an investigation, which it did. Mr. Burd admitted that he called Ms. Cline "Syphilis", but said he meant it as a joke.

68. A December 20, 1988 interoffice memo (Plaintiff's Exhibit 2) commenting on Ms. Knorr's complaint suggested that despite the history of complaints about Mr. Burd's "management style" "[w]e should consider giving Jerry another Management Award in January, 1989 for the excellent results produced in 1988." The memo went on to note that:

> Few people are able to maintain the level of intensity needed in collections as well as Jerry. This intensity probably is worth at least 100 fewer repossessions each year. In these terms, he is at least worth $500,000 each year to GECAL.

69. An interoffice memo documenting the Marcia Knorr situation, dated January 18, 1989 (Plaintiff's Exhibit 3) notes:

> [W]e have somewhat of a "history" of formal/informal complaints surrounding Jerry's management style and treatment of subordinates and colleagues.... [W]e simply don't get such complaints about other managers. While Jerry has clearly benefitted GECAL via his superior technical knowledge and quantitative results for many years, his often stormy relationships with others have been an ongoing exposure for us. He *does* criticize others in "public" settings, turns non-controversial discussions into arguments, generates defensiveness/ill-will

unnecessarily, and displays volatility/over-emotionalism.

70. Mr. Weissner sent a memo to Mr. Burd regarding the situation in February, 1989. The memo opened by noting that GECAL had "been the recipient of several complaints about your personal actions and management style." The memo went on to commend Mr. Burd for his department's performance during the past three years, and closed by expressing the desire that Mr. Burd "continue to focus on improving [his] management style...." Plaintiff's Exhibit 4.

71. In 1989, pursuant to the recommendations contained in the January 18 memo, GECAL transferred Mr. Burd to a position as Collections Administrator. The position was initially non-supervisory, but Mr. Burd now supervises four or five employees.

72. GECAL admits that one of the reasons it effected the transfer was because of Mr. Burd's mistreatment of the employees he supervised.

### Conclusions of Law

Before moving to the merits of the case, this court must address two of defendants' initial arguments. First, the defendants have argued that Ms. Cline's sexual discrimination claim is not timely. This court decided that it was, in *Cline v. General Electric Credit Auto Lease, Inc.*, 748 F.Supp. 650 (N.D.Ill.1990) (for purposes of this opinion, *Cline I*), the last opinion it issued in this case (denying, for the most part, defendants' motion for summary judgment). The court will not rehash the question here.

■ Second, the defendants claim that Ms. Cline's claim against GECAL is barred by the "exclusivity" provisions of the Illinois Worker's Compensation Act, Ill.Rev. Stat. ch. 48, par. 138.5 (1987) or, alternatively, that GECAL is not liable for a battery committed outside the scope of his authority and not in furtherance of the company's business.

The law and proof pertinent to both arguments are similar, so this court will ad-

dress them together. The Illinois Worker's Compensation Act provides that:

> No common law or statutory right to recover damages from the employer . . . for injury or death sustained by any employee while engaged in the line of his duty as such employee, other than the compensation herein provided, is available to any employee who is covered by the provisions of this Act. . . .

This is known as the "exclusivity" provision of the Act. The "exclusivity" bar, however, is not absolute, the courts have noted various exceptions to it. For instance, a plaintiff may avoid the bar if she is able to prove that the injury was not accidental. *Collier v. Wagner Castings Co.*, 81 Ill.2d 229, 237, 41 Ill.Dec. 776, 408 N.E.2d 198 (1980). The mere fact that a co-employee may have intentionally caused the plaintiff's injury is not enough to make the injury "accidental", however. *Id.* at 238, 41 Ill.Dec. 776, 408 N.E.2d 198; *Jablonski v. Multack*, 63 Ill.App.3d 908, 20 Ill.Dec. 715, 380 N.E.2d 924 (1st Dist.1978). Rather, the plaintiff must prove that "the employer has committed, commanded or expressly authorized the intentional act." *Collier* at 238–39, 41 Ill.Dec. 776, 408 N.E.2d 198. As the Illinois Supreme Court noted in *Collier*, "the law's paramount interest is to avoid shielding from liability one who intends to do harm and, further . . . the legislature could not be presumed to have intended to permit an intentional tortfeasor to shift his liability to a fund paid for with premiums collected from innocent employers." 81 Ill.2d at 240, 41 Ill. Dec. 776, 408 N.E.2d 198, citing *Jablonski*, 63 Ill.App.3d at 913, n. 1, 20 Ill.Dec. 715, 380 N.E.2d 924.

GECAL itself has provided the answer to the question whether it is liable for Mr. Burd's battery of Ms. Cline (and the facts set forth above leave no doubt that he did batter her). Internal GECAL memos demonstrate that it not only was aware of Mr. Burd's mistreatment of his employees, it tolerated it, because Mr. Burd's department performed so well. That means that the battery was not "accidental" within the meaning of the Illinois Workers' Compensation Act. GECAL "authorized" Mr. Burd's battery of Ms. Cline by failing to prevent assaults it was reasonably aware he was committing. GECAL is therefore not immune from suit for Mr. Burd's malfeasance, since it was well aware of his behavior, yet chose to do nothing.[3] Accordingly, the court turns to the merits.

### 1. "Gender" Harassment

As the court noted in *Cline I*, if Ms. Cline is to prevail against the defendants, she must demonstrate that she was harassed, if not sexually, then *because* of her sex. That is, Mr. Burd's mistreatment, although it was non-sexual in nature, was directed against her simply because she was a woman. *Cline I* at 655–56. For lack of a better term, and to distinguish this type of harassment from harassment which is sexual in nature (which the courts call "sexual harassment") this court in *Cline I* referred to the type of harassment in issue here as "gender" harassment. *Cline I* at 655. The court also held that to prevail, Ms. Cline was obligated to present a 'traditional' Title VII case—that is, according to the framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Specifically, Ms. Cline would have the burden of establishing a prima facie case demonstrating that 1) Ms. Cline is a member of a group protected under Title VII; 2) that she was harassed by her employer; 3) that the harassment was sufficiently severe or pervasive to alter the conditions of her employment; and 4) that male employees were not subjected to similar treatment. *Cline I* at 656.

If Ms. Cline is able to meet this burden, then a rebuttable presumption arises in favor of her claim. The defendants may overcome the presumption by producing evidence of a "legitimate, nondiscriminatory reason" for its actions. Should the defendants meet that burden of production, then Ms. Cline may still prevail by proving that the proffered reason is merely a pretext for discrimination. *Cline I* at 655.

---

**3.** See also this court's discussion of the question in *Cline I* at 656–57.

### 2. Prima Facie Case

■ Ms. Cline is a woman, therefore a member of a protected group. The question is whether the evidence produced at trial demonstrates that she was harassed severely enough to affect the conditions of her employment, and that the men with whom she worked were not similarly harassed.

The facts which this court has found to be true, and set forth above, demonstrate that Mr. Burd regularly yelled at Ms. Cline, called her insulting names, hit, pinched and pushed her, made a variety of rude and boorish comments to her and asked her offensive questions. In more expansive terms, Mr. Burd had the ability, and apparently the intent, to make life miserable for those employees whom he chose to harass—among them Ms. Cline. This is sufficient to meet the *Brooms v. Regal Tube Co.* standard for a "hostile working environment", 881 F.2d 412, 418–19 (7th Cir. 1989) (discussed more thoroughly in *Cline I* at 656). That is, Mr. Burd's conduct would "adversely affect the work performance and the well-being of both a reasonable person and the ... plaintiff...." 881 F.2d at 419. The evidence further supports Ms. Cline's contention that Mr. Burd's harassment did in fact affect both her work performance and her well-being.

Ms. Cline's prima facie case therefore rests on the question whether the harsh treatment she received was qualitatively different from the treatment received by the men in her department. This court finds that it was. Although GECAL did submit evidence of some men to whom Mr. Burd directed sarcastic comments (particularly Mr. Benson, an African–American man) the evidence was that his harassment of women was disproportionate, both quantitatively and qualitatively. There was *no* evidence that he ever physically assaulted men, while women were frequently subjected to "friendly" slaps, knocks and pinches. He occasionally criticized the appearance of some of his male employees—Ms. Cline testified that dressing for work each morning became an ordeal because no matter how hard she tried, she was frequently subject to some caustic comment about her appearance. Other women employees offered similar, credible testimony. Ms. Cline has made a prima facie case.

### 3. GECAL's Rebuttal

■ GECAL's proffered "legitimate, non-discriminatory reason" is that Mr. Burd's actions were taken "all in fun", or for the good of his department. To suggest that Mr. Burd was merely "joking" with Ms. Cline and the other women he allegedly hit, pinched and yelled at does nothing to explain why he reserved such frivolity for the women he supervised, rather than *all* the people in his department, women and men. Furthermore, it ignores the severity of the abuse he directed at many of the women who worked for him.

Beyond the open hostility he frequently directed at the women he supervised, Mr. Burd also insinuated himself into, and attempted to control, the most intimate details of their lives. Thus he went on "search and destroy" missions for Marilyn Sabounghi's cigarettes. He took over Maddie Ewing's finances, destroying credit cards *he* decided she didn't need. Some of the women who testified at trial, including Ms. Cline, stated that even dressing for work in the morning was a stressful experience; they feared his comments should he disapprove of the style, or even color of their clothes.

GECAL at one time characterized Mr. Burd as a "mother hen" who was constantly "watching out" for his underlings' best interests. To characterize the abuse described at trial as simply "excessive nurturing" is absolutely ludicrous. Mr. Burd's conduct was so far outside the bounds of decency that it would have "adversely affect[ed] the work performance and well being of [any] reasonable person, [including Ms. Cline]." *Brooms v. Regal Tube,* 881 F.2d at 419.

Mr. Burd's behavior may have inured to GECAL's benefit, GECAL estimates that he saved the department about $500,000 a year. This court would simply note that those savings did not come without a price. As this court noted above, the fact that Mr.

Burd took the hostile actions he did in the course of his employment, and for GECAL's benefit, and the fact that GECAL was for some time willing to permit his malfeasance to go unpunished, do not aid GECAL's case. Quite the contrary.

Since the reasons proffered by GECAL as explanation for Mr. Burd's behavior are simply not legitimate, this court finds that Ms. Cline's prima facie case has not been rebutted. She has proven that GECAL and Mr. Burd discriminated against her because of her sex. The court therefore turns to the remedy.

### 4. Damages

■ This court has already stated that it finds to be credible Dr. Luzwick's testimony that Ms. Cline's TMJ was caused by the stress she suffered while working at GECAL, and that the TMJ may have contributed to the onset of her tic douloureux. These conditions prevented Ms. Cline from continuing to work at GECAL and, indeed, led to her constructive discharge from the company (to return was to subject herself to the same conditions which had caused her disability in the first place—thus returning to the job was not a viable option for her).[4] Ms. Cline is therefore entitled to the full salary she would have earned had she remained at GECAL during the period of her disability—that is, the period between May, 1988 when she went on short-term disability leave and had her pay reduced and May 1990 when she achieved success in controlling the pain from her tic douloureux and began working again, earning substantially the same salary as she had earned at GECAL. See 42 U.S.C. § 2000e–5(g). Ms. Cline is entitled to prejudgment interest on that award. See *Hunter v. Allis–Chalmers Corp., Engine Div.*, 797 F.2d 1417 (7th Cir.1986). She is also entitled to her reasonable attorney's fees for bringing this action, 42 U.S.C. § 2000e–5(k), and is directed to submit appropriate materials supporting such an award.

■ These awards compensate Ms. Cline for her Title VII claim. She has also requested both compensatory and punitive damages for the battery Mr. Burd committed against her. Although she claimed $15,000 in actual damages, she submitted no evidence at trial supporting the proposition that she suffered $15,000 in damages when Mr. Burd slapped her on the arm or hit her on the head with a file (the only two batteries she alleges—see findings of fact 22(a) and (b)). Nonetheless, the fact that she was subject to such batteries certainly contributed to the medical condition which ultimately led to her constructive discharge. She is therefore entitled to nominal damages, and the court awards them in the amount of $200. See, generally, *Ustrak v. Fairman*, 781 F.2d 573, 578–79 (7th Cir.1986) (nominal damages appropriate where the fact, but not the extent, of injury has been proven).

■ Ms. Cline has also requested punitive damages. Courts (and juries) award punitive damages in order to punish a defendant for willful or malicious conduct, as well as to deter others from similar behavior. *Memphis Community School Dist. v. Stachura*, 477 U.S. 299, 106 S.Ct. 2537, 91 L.Ed.2d 249 (1986). In Illinois, a plaintiff requesting punitive damages must show that the defendant's behavior was exceptionally "antisocial" or "outrageous". See *Federal Deposit Insurance Corp. v. W.R. Grace & Co.*, 877 F.2d 614 (7th Cir.1989); *Ampat/Midwest, Inc. v. Illinois Tool Works Inc.*, 896 F.2d 1035 (7th Cir.1990); *Ramsey v. American Air Filter Co., Inc.*, 772 F.2d 1303 (7th Cir.1985). This court finds that these purposes are served by an award of punitive damages in this case. As discussed above, this court finds that Mr. Burd's treatment of Ms. Cline, including the two batteries, was willful, malicious and "outrageous". This court has also found that GECAL was aware of Mr. Burd's behavior and apparently tolerated it because Mr. Burd was "at least worth

---

**4.** This court set forth the test for constructive discharge in *English v. General Development Corp.*, 731 F.Supp. 305, 307 (N.D.Ill.1986). An employee is "constructively discharged" when

her working conditions become so intolerable that she is forced into involuntary retirement. The discussion above demonstrates that this condition was met in Ms. Cline's case.

$500,000 each year to GECAL." Punitive damages are therefore also appropriate in order to deter other companies from making similar economic decisions.

Because GECAL appears to have based its decision to permit Mr. Burd to harass Ms. Cline on Mr. Burd's worth to the company, this court will base its award of punitive damages on the same figure. Ms. Cline worked at GECAL for approximately nine months (August, 1987 until May, 1988), during which time she was subjected to all sorts of harassment by Mr. Burd, detailed above. That harassment was the tactic Mr. Burd used to save money for GECAL—by harassing the women in his department Mr. Burd forced them to work, and work hard, thus saving money for GE-CAL. After Ms. Cline began her medical leave, Mr. Burd, still trying to save GE-CAL's money, harassed her at home, sometimes calling her several times a day, continuing to call her "Syphilis" and demanding that she return to work. That harassment continued at least until August, 1988. By GECAL's estimate, Mr. Burd saved the company $500,000 during the year he made Ms. Cline's life miserable—it was in part *by* making her life miserable that he was able to save that money. This court finds that a punitive damages award of ten percent of the money Mr. Burd saved the company through his tyrannical tactics is appropriate. Accordingly, it awards Ms. Cline punitive damages of $50,000.

### Conclusion

The court finds for Ms. Cline and against the defendants on Counts 2 and 3 of the amended complaint (Count 1 was dismissed on defendant's motion for summary judgment). The defendants are ordered to pay damages as set forth above, and Ms. Cline is ordered to submit materials supporting an award of her reasonable attorney's fees.

### JUDGMENT

IT IS ORDERED AND ADJUDGED that judgment in the form of backpay for the period between May, 1988 and May, 1990 pre-judgment interest and reasonable attorney's fees is entered in favor of the plaintiff Phyllis Cline and against defendants General Electric Capital Auto Lease, Inc. and Jerome Burd on Count 2. Judgment in the form of nominal damages of $200.00 and punitive damages of $50,000.00 is entered in favor of plaintiff Phyllis Cline and against defendants General Electric Capital Auto Lease, Inc. and Jerome Burd on Count 3 of the amended complaint. Summary judgment is entered in favor of defendants General Electric Capital Auto Lease, Inc. and Jerome Burd and against plaintiff Phyllis Cline on Count 1 of the amended complaint.