Dennis D. VAUGHN, Plaintiff-Appellant,

v.

POOL OFFSHORE COMPANY, A DIVI-
SION OF the POOL COMPANY OF
TEXAS, Defendant-Appellee.

No. 81–3174.

United States Court of Appeals,
Fifth Circuit.

Aug. 25, 1982.

Dale C. Wilks, New Orleans, La., for plaintiff-appellant.

David L. McComb, G. Phillip Shuler, New Orleans, La., for defendant-appellee.

Before BROWN, GOLDBERG and POLITZ, Circuit Judges.

POLITZ, Circuit Judge:

Dennis D. Vaughn, an offshore oil rig roustabout, filed a complaint against his former employer, Pool Offshore Company, a Division of the Pool Company of Texas, (Pool) under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.*, and the Civil Rights Act of 1866, 42 U.S.C. § 1981, alleging racial discrimination in job assignments and complaining of a racially charged employment atmosphere which purportedly compelled him to quit his job. Finding that Vaughn failed to establish a prima facie case of employment discrimination under either statute, the district court entered judgment in favor of Pool. We affirm.

### Facts

Pool, a company engaged in the drilling and workover of offshore oil and gas wells, employed Vaughn as a roustabout on Pool Rig No. 9 in the Gulf of Mexico off the Louisiana coast, from June 22, 1977 until his resignation on November 9, 1977. Pool

Rig No. 9, located on an offshore platform belonging to Marathon Oil Company, was used in the workover of Marathon wells. The twelve Pool employees on the rig included a roustabout crew, two drilling crews, galley hands, and the top supervisor called the "toolpusher."

Roustabouts occupied the lowest rung on the Rig's employment ladder, followed in ascending order by roughnecks, derrickmen, drillers and finally, the toolpusher. Roustabouts performed general work such as cleaning, painting and loading and unloading boats, and were paid $4.74 per hour. Roughnecks performed more demanding work under the driller on the drill floor of the rig and were paid $5.58 per hour. Offshore crews worked seven-day "hitches." At the beginning of each hitch, qualified roustabouts were assigned to fill any vacant roughneck slot. Reassigned roustabouts were paid at the roughneck rate for that hitch. Each drilling crew worked a 12 hour tour. The roustabout crew usually worked the day tour, but occasionally was called out at night.

Pool's offshore crews worked alternating seven-day hitches, from Wednesday to Wednesday. During the seven days on duty, they lived and worked together within the restricted confines of the offshore platform. Life in these close quarters was, by all accounts, rowdy and rough. Raw pranks, crude practical jokes and verbal abuse abounded, some of it permeated with racial overtones.

Vaughn experienced a generous dose of this coarse treatment. About a month after he began working, his co-workers subjected him to a practice known as "doping" or "hazing."[1] He was seized by other Pool employees, stripped, and had his genitals covered with grease. Vaughn suffered the indignities of being doused with cold water or ammonia while showering, having the lights cut off while bathing, and having hot coffee poured in his back pocket. Pool em-

[1] It would appear that this treatment was frequently accorded, as a seeming rite of passage, to new offshore rig workers. The white toolpusher was "doped" twice. Others confirmed the same experience. Color played no part in selection of the subjects of this oil patch pasttime.

ployees, including the toolpusher, referred to Vaughn with the distasteful and crass appellations "nigger," "coon" and "black boy." Vaughn joined in similar opprobriums which, insofar as the record reflects, were bandied back and forth without apparent hostility or racial animus. Indeed, the relations between Vaughn and the other Pool employees, aside from the crude excesses of the platform atmosphere, were friendly and cordial.

The record reveals two incidents with racial overtones. A load being moved by a Marathon crane operator nearly struck Vaughn as he walked across the platform floor. An angry discourse ensued during which, as the trial court noted, "the Marathon employee's use of racial remarks [could not] be characterized as harmless." After learning of the incident, the toolpusher, who had no authority over the Marathon employee,[2] evidenced his displeasure while taking the matter up with the Marathon foreman.

The toolpusher also supported Vaughn during the other incident, which occurred on the day Vaughn resigned while the Pool crew was assembled in the galley. A television newscast reported that a black man had shot several people in downtown New Orleans. One member of the crew said: "That's just like a nigger; give him a gun and he shoots anything that moves," to the echo of laughter. Vaughn heard the remark, the laughter and the toolpusher's immediate admonition to the men that "they should have some respect for Dennis [Vaughn]."

The events which led directly to Vaughn's resignation began with the October 26—November 2 hitch, during which Vaughn was reassigned to fill a roughneck vacancy. During this hitch, Vaughn worked on one of the drilling crews, performing well. While being transported on a crew boat back to the platform for the hitch beginning November 9, the day driller told Vaughn that he was short a man and wanted Vaughn to work with his crew. Vaughn did not then object or otherwise comment. At the driller's request, the toolpusher assigned Vaughn to the drilling crew because he had performed well in that capacity and was the most experienced of the available roustabouts.

When the toolpusher informed Vaughn of his hitch assignment, Vaughn objected, complained about the toolpusher hiring inexperienced personnel (the other roustabout was less experienced than Vaughn) and quit his job. He said he did not wish to work as a roughneck, that floorhand work was harder than roustabout work and he did not want to do it two consecutive hitches. Upon his return to shore, Vaughn informed the Pool personnel administrator he had quit, assigning the same reasons. At neither time did Vaughn complain of racial discrimination, harassment or of an insufferable work atmosphere. At trial, Vaughn suggested that his resignation was the product of racial discrimination.

*Title VII and Discriminatory Environment*

In *Rogers v. Equal Employment Opportunity Com'n,* 454 F.2d 234 (5th Cir. 1971), *cert. denied,* 406 U.S. 957, 92 S.Ct. 2058, 32 L.Ed.2d 343 (1972), we held that a discriminatory and offensive work environment, "so heavily polluted with discrimination as to destroy completely the emotional and psychological stability of minority group workers," in itself may constitute a Title VII violation. *Id.* at 238. The question in this case is whether the harassment Vaughn experienced resulted from an environment "polluted with discrimination," or from an atmosphere replete with instances of humiliating acts shared by all.

▇▇▇ The district court found the latter, concluding that the hazing and practical joking should be viewed realistically as male interaction and not atypical of the work environment involved. The court determined that Vaughn used racial slurs along with his co-employees and that other Pool employees were subjected to the same

2. Marathon also kept a tool shed on the rig platform which had "KKK Headquarters" written across its facade. Pool had no authority or control over this part of the platform.

obnoxious treatment. The court found it significant that Vaughn's co-workers expressed amicable feelings towards Vaughn, which negated a characterization of the atmosphere as "dangerously charged with racial discrimination." Recognizing that derogatory remarks would constitute a Title VII violation "upon attaining an excessive or opprobrious level," the court was persuaded that the evidence presented did not suggest "a malicious or inordinate racial slur usage that would result in defendant's liability."[3] These factual findings are not clearly erroneous. Fed.R.Civ.P. 52(a).

Ample evidence supports the finding that nearly all rig employees were victims of the pranks at one time or another. The acts directed at Vaughn were usually accompanied by racially derogatory remarks. Vaughn, however, did not believe the pranks were racially motivated or that he was singled out for abusive treatment.[4] He did not participate in throwing ice water and ammonia on others while they were in the shower, or in "doping" other workers, and he complained to the toolpusher that these things were done. He perceived these unpleasantries as part of the life on the rig, to be endured by all. Vaughn's perception of his environment is a significant factor; whether discrimination exists is, by its very nature, often a subjective inquiry. We agree with the district court that the rig environment was coarse, rowdy, and generally abusive, but not "polluted with discrimination" within the meaning of *Rogers.*

### Title VII and Constructive Discharge

■ The constructive discharge doctrine applies when an employee has resigned his employment under such circumstances that his resignation is treated as a discharge for the purpose of proving a prima facie case of employment discrimination.[5] *Meyer v. Brown & Root Const. Co.,* 661 F.2d 369 (5th Cir. 1981); *Bourque v. Powell Electrical Manufacturing Co.,* 617 F.2d 61 (5th Cir. 1980); *Calcote v. Texas Educational Foundation,* 578 F.2d 95 (5th Cir. 1980); *Young v. Southwestern Savings and Loan Association,* 509 F.2d 140 (5th Cir. 1975); *Rogers v. Equal Employment Oppor-*

---

**3.** The district court's legal analysis improperly focused on the intent of those who created the environment. We specifically noted in *Rogers* that it is not necessary to show intent in a case challenging a discriminatory working environment. 454 F.2d at 238–39 (*citing Griggs v. Duke Power Co.,* 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971)). The *Rogers* intent analysis retains its vitality, although decided prior to *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), which infused the intent element into disparate treatment cases. *See* Judge Skelly Wright's discussion of *Rogers* in *Bundy v. Jackson,* 641 F.2d 934 (D.C.Cir.1981), reiterating the *Rogers* principle that a discriminatory work environment need not result from intentional discrimination in order to violate Title VII.

**4.** Although Vaughn's testimony offers some conflicting information concerning how he felt about life on the rig, we find that it supports the conclusion that Vaughn did not believe his treatment was racially motivated. On direct examination, he stated that he resigned not because he did not like the floorhand job, but because he was "just full of what had been going on out there," and because of the television news incident, which had occurred earlier that day. On cross examination, a different picture emerged:

Q. Do you think they did that [the pranks] to you because you were black?
A. I'm going to be honest with you. I never did think they did it to me because I was black or what, just the idea I didn't play those games. I never did anything like this to nobody.
. . . .
Q. . . . What about the doping, do you feel that that was done to you because you were black or is that another instance of something you simply didn't like and you complained about it?
A. Well, it was an incident that I just didn't like what they did to me.
Q. But, are you contending that it was done to you because you were black, or do you know?
A. No, I wouldn't, I couldn't say, I don't think so. But it's just what they did, you know.

**5.** A prima facie case of employment discrimination involving discharge under Title VII requires a showing that the plaintiff (1) was a member of a protected class, (2) was qualified for the job from which he was discharged, (3) was discharged and (4) after the discharge the employer filled the position with a non-minority member. *Marks v. Prattco, Inc.,* 607 F.2d 1153, 1155 (5th Cir. 1979).

*tunity Commission*, 454 F.2d 234 (5th Cir. 1971), *cert. denied*, 406 U.S. 957, 92 S.Ct. 2058, 32 L.Ed.2d 343 (1972).

The guide for determining whether an employee has been constructively discharged was articulated in *Young v. Southwestern Savings and Loan Association*, 509 F.2d at 144:

> The general rule is that if the employer deliberately makes an employee's working conditions so intolerable that the employee is forced into an involuntary resignation, then the employer has encompassed a constructive discharge and is as liable for any illegal conduct involved therein as if it had formally discharged the aggrieved employee.

In *Bourque v. Powell Electrical Mfg. Co.* we rejected the suggestion that the imposition of intolerable working conditions must be with the purpose of forcing the employee's resignation, stating that to find constructive discharge, " 'the trier of fact must be satisfied that the ... working conditions would have been so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign.' " 617 F.2d at 65 (*quoting Alicea Rosado v. Garcia Santiago*, 562 F.2d 114 (1st Cir. 1977)).

The focus, then, in a constructive discharge case is on the reasonable state of mind of the putative discriminatee. *Bourque*, 617 F.2d at 65. We are not persuaded that a reasonable employee would have found working conditions on Rig No. 9 so racially difficult or unpleasant as to compel one to quit his job.

Vaughn's complaints fall into two categories: (1) the pranks, tricks, heavy-handed humor and crude language, and (2) working two consecutive hitches as a roughneck on the drilling floor. As noted, nearly all employees were subjected to the former. Vaughn acknowledged this, effectively laying to rest the suggestion that he was singled out because of his race. Vaughn shared this obnoxious treatment with the other employees. We decline to hold, therefore, that this treatment would compel the resignation of a reasonable employee because of racial discrimination. Any of the employees reasonably might have resigned because of offended sensibilities, but any such resignation would not subject the employer to the sanctions of Title VII. As a final note on this point, we cannot but observe that all but the television incident occurred during Vaughn's first few weeks on the job. The resignation came months later.

That leaves, then, the assignment to work as a floorhand for two consecutive hitches. We find no Title VII violation here. Roustabouting is entry level work, the least demanding job for the lowest pay on the rig. Roughnecks are immediately involved in the work of the rig, the drilling itself. This higher paying job is more difficult, more confining, and places the worker under the watchful eye of his supervisor, the driller. Roughnecks usually are in constant motion, except for breaks and breakdowns. Roustabouts work under the supervision of the crane operator and move all over the platform. They are not constantly in view of their supervisor; they are not in constant motion. Breaks are more frequent and more easily secured. Drilling operations do not revolve around them.

Vaughn preferred the lower paid, easier work of a roustabout. He is entitled to his preference. But when his employer has need of him in a more responsible, better paying job, and selects him because of his proven ability to do the work, this cannot serve as the basis for charging his employer with congressionally forbidden activity. Vaughn could decline to work as a roughneck, but he cannot, through legal alchemy, make Pool's attempted work assignment into a Title VII verboten.

### 42 U.S.C. § 1981

Under 42 U.S.C. § 1981, a plaintiff must establish intentional discrimination, *Washington v. Davis*, 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976); *Whiting v. Jackson State University*, 616 F.2d 116, 121 (5th Cir. 1980). The requirements articulated in *McDonnell Douglas v. Green* and

*Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981), must be satisfied. We have affirmed the trial court's finding that Vaughn failed to establish a prima facie case of employment discrimination under Title VII; likewise, he has not acquitted the burden imposed by § 1981.

The judgment of the district court is AFFIRMED.