**Donald C. NEWTON, Petitioner,**

v.

**DEPARTMENT OF The AIR FORCE, Respondent.**

No. 95–3293.

United States Court of Appeals, Federal Circuit.

June 4, 1996.

Rehearing Denied June 28, 1996.

Michael A. Taylor, Taylor, Moore & Plater, Oklahoma City, Oklahoma, argued, for petitioner.

Major David W. Claypool, AFLSA/JACL, Arlington, Virginia, argued for respondent. Timothy D. Wilson, Lt. Col., U.S.A.F., Chief Civilian Personnel Branch, General Litigation Division, Air Force Legal Services Agency and Clarence P. Guillory, Captain, U.S.A.F., Trial Attorney, Air Force Legal Services Agency, Arlington, Virginia, were on the brief, for respondent.

Before MICHEL, PLAGER, and LOURIE, Circuit Judges.

Opinion for the court filed by Circuit Judge MICHEL. Dissenting opinion filed by Circuit Judge PLAGER.

MICHEL, Circuit Judge.

Donald C. Newton appeals from the December 16, 1994 decision of the Merit Systems Protection Board (Board), No. DA–0752–94–0680–I–1, sustaining one of two of the Department of the Air Force's (Air Force) charges against Newton and its decision to remove him. The Administrative Judge's (AJ) initial decision became final when, on January 20, 1995, the time within

which to file a petition for review by the full Board expired. The appeal was submitted for decision after oral argument on March 4, 1996. Because there can be no dispute that by his admitted acts Newton violated the Air Force regulation under which he was charged, and the Air Force's choice of penalty does not exceed the bounds of its discretionary authority, we affirm.

## BACKGROUND

Newton worked as an aircraft engine repair supervisor at Tinker Air Force Base in Oklahoma. He had worked at Tinker since April 1976, and as a supervisor since 1988.

It is undisputed that, on June 18, 1994, the following occurred: Newton was supervising employees during an overtime shift in Building 3001 at Tinker. Guy Lewis, an African-American, was among the group that Newton was supervising. Following his return from lunch, Newton took two chemical mixing sticks, each approximately two inches tall and one inch wide, and used some wire to form them into the shape of a cross. He then placed the cross on a cart, sprayed the cross with alcohol, and lit it on fire in the work area where Lewis and others were working. As the cross burned, Newton called Lewis' attention to it. Newton then put the fire out and returned to work.

On Monday, June 20, the incident was reported to supervisor Paul Thomas. Thomas questioned a number of employees about it and, later that day, placed Newton on nonduty pay status. The incident attracted local media coverage, both on television and in local papers.

By letter dated June 27, Thomas proposed Newton's removal. Specifically, the proposal cited Newton's "deliberate actions on 18 June 1994 that are considered racial toward a subordinate minority employee" and "reckless disregard on 18 June 1994 for the safety of personnel and the work environment."[1] The first charge was based expressly on Item 29 of Attachment 3, AFR 40–750 (July 23, 1982) ("Guide to Disciplinary Actions"). Item 29 proscribes invidiously discriminatory conduct in the workplace as follows:

29a: Discrimination based on race, color, religion, sex, national origin, age, or handicapping condition. Includes sexual harassment. Also includes making racial or ethnic slurs, or disseminating literature containing such slurs. Consider circumstances and the effect on the person(s) discriminated against, use of abusive language, violent treatment or insulting demeanor.

Penalty for First Offense: Reprimand to 5–Day Suspension.

29b: If the discrimination was deliberate. NOTE: If a supervisor or manager has engaged in an act of discrimination, a decision should be made as to whether he or she should be reassigned or changed to a lower grade to a position of a different character.

Penalty for First Offense: Reprimand or Removal.

On August 8, after considering Newton's response to the proposed removal, Kenneth Breshears, the deciding official, removed Newton effective August 9. The removal decision makes clear that Breshears imposed the penalty of removal only after careful consideration of all the so-called "*Douglas* factors."

Newton appealed his removal to the Board on August 26. Newton's primary contention was that he had not discriminated against Lewis because he had not intended to do more than joke with him. On December 16, after conducting a hearing, the AJ issued his decision sustaining both the first of the agency's two charges—that is, "engaging in deliberate racial actions toward a subordinate minority employee"—and the appropriateness of removal as a penalty. The AJ credited Newton's contention that he meant only to joke with Lewis but nevertheless concluded that the elements of the charged offense had been proved:

I find that the charge that the appellant engaged in deliberate racial conduct towards a subordinate minority employee is actionable misconduct. I further find that the appellant, by placing the lighted cross in front of Lewis, did engage in deliberate

---

1. The work area where the incident occurred contained flammable paint.

racial conduct towards a subordinate minority employee, as charged. *The appellant's behavior* in fashioning the cross, setting it afire, and showing it to Lewis *was deliberate, rather than inadvertent* conduct. The conduct was racially offensive: it is unnecessary to explore what a burning cross symbolizes to African–Americans. While the appellant may have intended at the time of the incident to merely joke with Lewis, I find that his intentions are not relevant to the misconduct as it is charged and, therefore, are not exculpatory. Accordingly, I conclude that the agency has proven the charge by a preponderance of the evidence.

(Emphasis added; record citations omitted). As the highlighted text makes clear, the AJ equated the term "deliberate" from Item 29b with the phrase "not inadvertent."

Having sustained only one of the two charges against Newton, the AJ undertook an extended re-analysis of the propriety of removal as the penalty. Newton suggests at various points in his briefs on appeal that the penalty decision should be vacated because the AJ "fail[ed] to consider all of the relevant factors." To read the AJ's analysis is to know that this mischaracterization of the record is unavailing:

I first note that there are a number of mitigating factors in the appellant's favor. The appellant has been Federally employed since April 14, 1976, with no prior disciplinary action. He has been a supervisor at the facility for approximately six years, and his work performance for that period has been above fully successful.

Further, it is undisputed that the appellant acted without malice and without a discriminatory intent when he lit the cross on fire. The testimony was uniform and credible that the appellant did not use racially provocative speech or treat his subordinates or others in a disparate manner based on their race. Further, it is unrebutted that the appellant and Lewis had a joking relationship, and that Lewis frequently employed racially charged language in that relationship. The appellant and co-worker Timothy Ray Moore testified that Lewis referred to the appellant as

a "white hillbilly mother f—ker" or a "Klan mother f—ker," and that Lewis told Moore, referencing the appellant, "I'll bet that hillbilly mother f—ker is running the KKK." The appellant testified, with corroboration from Moore, that Lewis' racial remarks were unilateral, and that he did not respond in kind to Lewis.

Despite these mitigating factors, I find that the sustained charge of deliberate racial conduct merits the penalty imposed by the agency, and so disagree with the appellant's arguments that the penalty was too severe. The appellant, as an experienced leader who supervised between 15 and 75 employees, was properly held to a high standard of conduct because he occupied a position of trust and authority. He knew through his training that he needed to be aware of discrimination in the workplace. Therefore, he was obliged to discipline employees for racially offensive conduct: not join them in it. Moreover, it must have been self-evident to the appellant that he was taking the joking to an extreme by lighting the cross on fire in front of Lewis.

The burning of a cross, for whatever reason, cannot be justified. It is not a quaint artifact of our nation's past that can be perceived without emotion. It represents bigotry that our society has combatted for many years but that still exists today. The appellant himself noted in his testimony that, on the same day that the incident at the facility was reported on television, another cross burning was reported in Oklahoma.

The appellant's engaging in such extremely serious misconduct affected not only his image as a supervisor, but involved the entire facility as well. The appellant acknowledged that there were other minority employees in the area at the time of the incident who could have seen the cross and not known that it was meant to be a joke. The deciding official stated that the public perceived the appellant's actions as a racist threat; that the event was recounted in local print media and on television; and that the appellant created a potentially volatile situation that placed the facility's reputation within the

community at risk. I agree with his assessment that, despite the appellant's abilities, his removal was in the best interests of the agency. Therefore, while the public's perception of the cross burning is only one factor to be considered in determining the propriety of the agency's penalty, I find it a critical and dispositive factor under the circumstances of this case.

(Footnote, case and record citations omitted). We reproduce the AJ's decision at such length to demonstrate his sensitivity to the many factors in play.

Newton appeals from the AJ's decision, contending that the charge, when properly understood, is not supported by substantial evidence. Specifically, Newton contends that (a) an act cannot be charged under Item 29b, which requires that it be "deliberate," unless it is undertaken with a specific discriminatory intent, and (b) it is undisputed that he had no such intent. As Newton puts it, "[u]nder [Item 29b] the penalized action must be a 'deliberate intentional act of discrimination'.... [The] penalty *should have been* imposed under subsection 29a instead of 29b ... because [the] action was *not* intentional racial discrimination." [2] Regarding the Air Force's decision to remove him, Newton contends that the AJ ought to have lightened the penalty in view of Newton's undisputed lack of discriminatory intent and excellent service record.

### ANALYSIS

 Item 29b, unlike 29a, by its express terms proscribes only "deliberate" discrimination. Again, Newton contends that his act was not culpably "deliberate" because he intended only to be funny, not to be hostile or discriminatory toward Lewis or others along racial lines. The government responds that "the patently offensive racial nature of the act, combined with the steps [Newton took to burn the cross], clearly reveal that [his] actions were deliberate." Putting it another

way, the government asserts that "[t]he Administrative Judge correctly found that Petitioner's conduct was deliberate, not inadvertent, and that although Petitioner may have intended his conduct as a joke, his intentions are not relevant to the charge." The government, like the AJ, equates "deliberate" with "not inadvertent." We discern no error in the AJ's construction given the facts of this case.

The drafters of Item 29b chose to proscribe "deliberate" discrimination, rather than, as Newton would have it, conduct undertaken with specific discriminatory intent. First, there is nothing about the term "deliberate," considered by itself, that suggests that a specific intent element inheres in the prohibition of Item 29b. Second, considering Item 29 as a whole, nothing about the conduct that Item 29a proscribes suggests that the government's construction of the term "deliberate" in Item 29b would make that provision redundant. For example, Item 29a forbids "disseminating literature containing such [racial or ethnic] slurs." One might contend that it is impossible to disseminate such literature inadvertently; the argument, if accepted, would render Item 29b redundant and thus severely undermine the government's equation of "deliberate" with "*not* inadvertent." But the contention is unavailing, for it is not difficult to imagine an act of inadvertent dissemination. Consider the case where an employee brings magazines to work for placement in a general reading area and, unbeknownst to him, one or more of these magazines contains patently offensive racist editorials or cartoons. This conduct, while inadvertent, would certainly constitute the dissemination of racially charged material into the work environment, thereby violating the prohibition of Item 29a. Federal agencies have it well within their power to seek to prevent such inadvertent injuries to the workplace environment. *See Carosella v. United States Postal Serv.*, 816 F.2d 638, 643

**2.** Newton also contends that he was actually charged under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–2(a)(1), for creating of a "hostile work environment," and that "the agency did not present sufficient evidence that [he] created a hostile work environment from the single incident." The government responds,

quite correctly, that the notice of proposed removal clearly charged Newton under Item 29b, not Title VII. Whether Lewis could prevail against the Air Force on a Title VII claim arising out of Newton's conduct is thus simply irrelevant to whether the charge against Newton can be sustained.

(Fed.Cir.1987) ("An employer is not required to tolerate the disruption and inefficiencies caused by a hostile workplace environment until the wrongdoer has so clearly violated the law that the victims are sure to prevail in a Title VII action.").

An agency's interest in disciplining racially charged conduct is all the greater when, as here, the conduct is deliberate rather than inadvertent. Newton does not suggest that he was ignorant of the racially charged meaning of a burning cross; indeed, such a suggestion would fly directly in the face of his claim to have intended to joke with Lewis in the same manner that Lewis joked with him. Moreover, as the AJ noted, no reasonable person even remotely aware of our nation's history could fail to know the racist terrorism that a burning cross symbolizes. Newton's removal for this patently racial and deliberate act vindicates the Air Force's legitimate interest in maintaining an efficient operation. Any injury that Lewis may or may not have actually suffered is beside the point. The charge against Newton, correctly understood, has been proved beyond doubt.

Finally, although we are *not* reviewing a Title VII claim, it is worth noting that our construction of the word "deliberate" in Item 29b is fully consistent with the "hostile work environment" case law. In *Rogers v. EEOC,* the earliest circuit case to construe Title VII as covering such claims, the court recognized that "the thrust of Title VII's proscriptions is aimed at the consequences or *effects* of an employment practice and *not* at the employer's *motivation."* 454 F.2d 234, 239 (5th Cir.1971) (emphasis added), *cert. denied,* 406 U.S. 957, 92 S.Ct. 2058, 32 L.Ed.2d 343 (1972). The Supreme Court recently reaffirmed that conduct that poisons the workplace is actionable "so long as the environment would reasonably be perceived, and is perceived, as hostile or abusive," *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, ——, 114 S.Ct. 367, 371, 126 L.Ed.2d 295 (1993), whether or not the abuser specifically intends that it should be so. The existence of specific discriminatory intent *vel non* is, in short, not an element of a "hostile work environment" claim. *See, e.g., King v. Frazier,* 77 F.3d 1361, 1363 (Fed.Cir.1996) ("[T]he

arbitrator should have evaluated whether Mr. Frazier's conduct created a hostile or abusive environment from the perspective of the one being harassed. Instead, it is apparent that he viewed the situation from Mr. Frazier's perspective by introducing intent as an element of the offense. By so requiring, the arbitrator improperly borrowed the mens rea requirement from criminal law and interjected it into sexual harassment law."); *Bolden v. PRC Inc.,* 43 F.3d 545, 551 (10th Cir.1994) ("[I]t must be shown that ... the harassment was racial *or* stemmed from racial animus.") (emphasis added), *cert. denied,* —— U.S. ——, 116 S.Ct. 92, 133 L.Ed.2d 48 (1995); *Ellison v. Brady,* 924 F.2d 872, 880 (9th Cir.1991) ("Well-intentioned compliments by co-workers or supervisors can form the basis of a sexual harassment cause of action if a reasonable victim of the same sex as the plaintiff would consider the comments sufficiently severe or pervasive to alter a condition of employment and create an abusive working environment."); *Bundy v. Jackson,* 641 F.2d 934, 945 (D.C.Cir.1981) ("Sexual stereotyping through discriminatory dress requirements may be benign in intent ... yet it violates Title VII."); *Vaughn v. Pool Offshore Co.,* 683 F.2d 922, 925 n. 3 (5th Cir.1982) ("The district court's legal analysis improperly focused on the intent of those who created the environment. We specifically noted in *Rogers* that it is not necessary to show intent in a case challenging a discriminatory working environment."). Thus, where employees can reasonably perceive the conduct in question to be hostile or abusive, the actor's lack of specific discriminatory intent does not prevent his or her deliberate conduct from being actionable under Title VII.

As for the Air Force's choice of penalty in the instant case, it is well-established that, on appeal, the AJ's "affirmance of the agency's choice of penalty will not be disturbed unless it is so harsh and inappropriate as to exceed the agency's discretionary authority." *Carosella,* 816 F.2d at 643; *see also DeWitt v. Department of the Navy,* 747 F.2d 1442, 1445 (Fed.Cir.1984) ("This court will not disturb the agency's choice [of penalty] unless the severity of its action appears totally unwarranted in light of the relevant factors."), *cert. denied,* 470 U.S. 1054, 105

S.Ct. 1759, 84 L.Ed.2d 822 (1985). As shown above, the AJ sustained the decision to remove Newton only after careful and expressed consideration of all the relevant factors, concluding, correctly, that the Air Force has the broad discretion to remove supervisors for violations of Item 29b in the interests of the efficiency of its operations. The Air Force's concerns over the severe nature of the offense, its effect on employees at Tinker, and the threat it posed to Tinker's reputation, and thus its ability to operate, in the surrounding community are entirely legitimate. We cannot conclude that, in the circumstances of this case, the removal "appears totally unwarranted." *Id.*

For the foregoing reasons, the AJ's decision is

*AFFIRMED.*

PLAGER, Circuit Judge, dissenting.

I respectfully dissent. The removal of Newton from federal employment cannot be sustained under the charge brought. Newton, a Caucasian, the supervisor in the aircraft engine repair unit, permitted an employee, Lewis, an African–American, to engage him in a highly inappropriate joking relationship. The joking relationship included the use by Lewis (but not by Newton) of racially charged language. Specifically, Lewis would address Newton as a "white hillbilly mother fucker," and as a "Klan mother fucker," and would comment openly to others, with reference to supervisor Newton, that "I'll bet that hillbilly mother fucker is running the KKK." Newton would not respond in kind, but at the same time did not take appropriate action to discipline Lewis for his improper behavior toward his supervisor; indeed, for whatever reasons, Newton seemed to condone if not encourage Lewis' improper behavior.

The inevitable happened. Consistent with the joking relationship, Newton played the role of "Klan mother fucker" graphically, and pulled the stunt of burning in front of Lewis two popsicle-like chemical mixing sticks shaped in the form of a cross. It was not until several days later, perhaps after Lewis described the event to others, that Lewis decided he was offended and initiated a complaint.

The evidence is undisputed that Newton, in his eighteen years of federal service, including six years as a supervisor, had an unblemished record. He had been given training about the evils of discrimination in the workplace. There is not the slightest taint of prior racially-discriminatory conduct on his part. One cannot help but wonder if Newton suddenly, without explanation, appeared in front of a Black employee with a burning cross, would the Air Force have simply fired him without further thought, or might they have undertaken to determine whether he was having some kind of mental breakdown, or to seek some other explanation for such aberrant behavior.

Here there is an obvious explanation for his behavior. Newton permitted himself to be in an improper relationship with an employee, and in a misguided effort to participate in that relationship he acted in a highly inappropriate manner for a person in a supervisory position. The obvious response by the Air Force to this situation would have been to discipline Lewis for unacceptable behavior toward a supervisor, and to discipline Newton for failure to effectively supervise, perhaps removing him from his supervisory position.[1]

The AJ, though recognizing the circumstances in which this burning of the sticks occurred, nevertheless upheld the dismissal of Newton on the charge brought by the Air Force of engaging in deliberate racial discrimination under Item 29b of the Air Force's "Guide to Disciplinary Actions." The preceding Item, Item 29a, describes various kinds of proscribed discriminatory conduct by an employee, including sexual harassment and making racial or ethnic slurs. The penalty provided for a first offense is reprimand to 5-day suspension. Item 29b implicitly

---

1. It is interesting to note that the Air Force Guidelines admonish the reviewing officer to consider, even in the case of 'deliberate' discrimination by a supervisor, "whether [the offending supervisor] should be reassigned or changed to a lower grade to a position of a different character." Item 29b NOTE.

incorporates the proscriptions in 29a, and applies if the discrimination was "deliberate." Then the penalty may include removal.

The language of 29b creates a puzzle. If 29b requires "deliberate" discrimination, what kind of discriminatory conduct is proscribed by 29a? Presumably it must be non-deliberate, that is, accidental or unintentional conduct. But how does one engage in accidental discriminatory conduct? The Government, with the AJ's acquiescence, solves this verbal dilemma by arguing that "deliberate" means "not inadvertent." The panel majority sees no error in that construct. Indeed, to prove the point, the panel majority hypothesizes the case of an employee who brings a magazine into the workplace. The magazine, unbeknownst to the employee who has not read it, contains offensive material, perhaps an ethnic slur. The employee, we are advised, thereby violates the prohibition of Item 29a.

I cannot accept that proposition. I do not believe that is what the Air Force Guidelines are intended to say, and if it is, I do not believe this could possibly be upheld. Under that reading of the law, the mail clerk who works in the Pentagon and delivers to a subscriber's office in the building, along with the other mail, a copy in the proverbial plain brown wrapper of a magazine containing a story using explicit "street" language, could be fired without delay.[2] This not only defies common sense, but raises the most profound questions of Due Process and First Amendment liberties. *See e.g. Cohen v. California,* 403 U.S. 15, 91 S.Ct. 1780, 29 L.Ed.2d 284 (1971) (a person who knowingly wore to court a jacket that said on the back, "Fuck the Draft," was Constitutionally protected from punishment). *See also,* Kent Greenawalt, *Insults and Epithets: Are They Protected Speech ?,* 42 Rutgers L.Rev. 287 (1990).

Furthermore, plain English stands in the way of the Government's effort to re-interpret the meaning of "deliberate." Black's Law Dictionary defines the adjective "deliberate" as "[w]ell advised; carefully considered; not sudden or rash; circumspect; slow in determining. Willful rather than merely intentional." Black's Law Dictionary 426

(6th ed. 1990). Webster's likewise defines "deliberate" as "characterized by or resulting from slow careful thorough calculation and consideration of effects and consequences: not hasty, rash, or thoughtless." Webster's Third Int'l Dictionary, Unabridged 596 (1968). However inappropriate the various interactions between Lewis and Newton were, and however salted with racially charged language, the facts leave no doubt that neither was engaged in "deliberate racial discrimination" toward the other. To misapply the prohibition against racial discrimination in the workplace to a case involving a breakdown in supervisory authority, but in which no racial discrimination as such is involved, is to demean the importance of the prohibition, just as describing non-comparable events as a "holocaust" denigrates from the meaning and significance of that term.

Nor is the charge here that of a violation of Title VII, with its concept of a hostile work environment. Whether Newton, or Lewis for that matter, could be successfully prosecuted for a violation of that Act is not before us.

The AJ in his opinion made clear what was really at stake in this case. The Air Force was sorely embarrassed by the media attention given to this event, and decided that removal of Newton on discrimination grounds would placate its critics. As the AJ put it, "while the public's perception of the cross burning is only one factor to be considered in determining the propriety of the agency's penalty, I find it a critical and *dispositive* factor under the circumstances of this case." (My emphasis.)

One can abhor a deliberate act of cross-burning and all that it connotes, without condoning a misapplication of the law. The judicial decision whether there was such an act, and whether there was a violation of law, cannot be influenced by public notoriety or even by public demand for retribution. Being perceived as politically-correct may be an appropriate goal for political institutions, and it may be that the Air Force considers itself a political institution. Courts are not politi-

**2.** Item 29a refers to "Discrimination based on ... sex."

cal institutions, and it is our responsibility to apply the law as it is written. However poorly Newton may have behaved as a supervisor, on the undisputed facts of the case he did not engage in an act of "deliberate racial discrimination" against Lewis, by any understood meaning of that term. The contrary decision by the Board, upholding the Agency, is without substantial evidence in the record to support it, and is contrary to law. I would reverse the decision of the Board.